# HEATON *v.* MAYOR & CITY COUNCIL OF BALTIMORE

[No. 121 (Adv.) September Term, 1969.]

*Decided July 8, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Roger D. Redden,* with whom was *Lewis A. Noonberg* on the brief, for appellant.

*Robert Edelson, Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The appellant, a resident and real estate taxpayer of Baltimore City, sought in the Circuit Court of Baltimore City declarations that: (1) Ch. 6 of the Laws of Maryland of 1969, which removed the 5% interest ceiling on bonds of the City authorized under some twenty-nine prior bond acts and proposed to be issued, was invalid and void because it was improperly enacted as an emergency measure; (2) the results of a special referendum election, authorized by Ch. 6, to ascertain the will of the voters of Baltimore City as to whether the 5% interest ceiling should be removed or retained were null and void because of improper voting methods used in that election; and (3) alternatively, if Ch. 6 be held to be valid that the City is limited to payment of interest on its bonds at a coupon rate not exceeding 6% per annum under Art. III, § 57, of the Constitution of Maryland.

Judge Carter declared in each instance contrary to the declaration sought by the appellant. We agree with his

declarations for the reasons he gave in a careful and thorough opinion, as follows:

"The facts out of which the instant suit arose are as follows: As of January 1, 1969, the Mayor and City Council of Baltimore had no authority to borrow money for its capital improvements program at a rate or rates of interest in excess of 5% per annum. On February 11, 1969, Senate Bill No. 381 was introduced in the Senate of Maryland seeking repeal of those portions of 30 separate bond enabling acts, enacted between 1951 and 1968, which provided that the rate or rates of interest to be paid in connection with bonds issued by the City under the authority of those enabling acts should not exceed 5% per annum.

"After passage by the Senate, which eliminated Chapter 740 of the Acts of 1968 from the Acts to be amended, the Bill was substantially amended in the House of Delegates on March 14, 1969. The amendments made the Bill an emergency measure and empowered the City by ordinance to call a special referendum election to submit the proposed interest limitation removal to the qualified voters of Baltimore City. By votes of 102 to 7, the rules were suspended and the Bill, as amended, passed by the House. On March 17, 1969, the Senate concurred in the House amendments and enacted the Bill. On the morning of March 24, 1969, the Bill was signed by the Governor and designated Chapter 6 of the Laws of Maryland of 1969. On the evening of the same day an ordinance exercising the authority provided in Chapter 6 was introduced into the Baltimore City Council. This ordinance, in addition to amending the various bond ordinances which contained a stated 5% interest limitation, provided for the holding of a special referendum election in Baltimore City on May 13, 1969, and further provided that the voters at the election could cast a single vote for or against the questions submitted, as well as to vote for or against each individual question. This ordinance was approved by the Mayor on April 2, 1969, as Ordinance No. 417.

"There had been 39 separate ordinances passed by the City Council and submitted to and approved by the vot-

ers of Baltimore City at various regularly held elections in exercise of the authority granted to the City by the 29 enabling acts the provisions of which had been amended by Chapter 6. Accordingly, the ballot prepared for the special election set forth 39 separate questions running from left to right across the face of the voting machines by years of City Council meetings and, for each such meeting, by ordinance number, beginning with Ordinance No. 1611 of 1951 (Off-Street Parking) and ending with Ordinance No. 151 of 1968 (Schools).

"The questions were similarly presented and described in the notices published, as follows: (1) by the Commissioners of Finance in the Baltimore Afro-American, the News-American and The Sun on Tuesday, April 29, 1969, and (2) by the Board of Election Supervisors in The Daily Record, The Evening Sun and the News-American on May 1 and 8, 1969, in The Sun on May 2, and 9, 1969, and in the Baltimore Afro-American on May 3, and 10, 1969.

"The special referendum election was held as scheduled on Tuesday, May 13, 1969. The sample ballot and the voting instructions made available to voters at the polls plainly instructed the voters that the one purpose for holding the election was to allow the voters to decide whether they would approve a change in the interest rate limitation on 39 loans previously approved by them, and that there were no party issues or candidates on the ballot.

"The arrangement of the machines was such that the top line of levers was marked for a FOR vote and the bottom line of levers was marked for an AGAINST vote. Each individual question was identifiable in a descending vertical column beginning with the description of the question on the card at the top of the machine and descending by reference to question number and purpose (e.g., 'Street Lighting') through the individual 'FOR' lever on to the individual 'AGAINST' lever. The machines were so set up that two master levers were avail-

able at the extreme left hand side. The top one, if pulled to the left, would throw down all the individual levers FOR. The bottom one, if pulled to the left, would throw down all the individual levers AGAINST. There were instructions on the operation of these master levers set out in the sample ballot, in the instructions to voters and also in the notices published by the Board of Election Supervisors.

"It was possible for a voter to vote either FOR or AGAINST all questions with one motion. It was further possible to vote FOR or AGAINST all questions by use of the master lever and to go back and change individual votes by throwing back up one or more of the individual levers thrown down by the master lever and thereafter to throw down the other lever dealing with each separate question. Finally, it was possible to vote on any combination of individual questions without touching the master lever.

"The outcome of the Special Referendum Election was that the interest rate ceiling of 5% was lifted on all of the 39 previously approved loans.

"The necessity for the passage of Chapter 6 and Ordinance No. 417 was a result of the practice of the City to advertise for and accept construction bids on new capital projects prior to the sale of bonds authorized to be sold to finance such projects only when the following conditions have been met with respect to each such project: (a) an enabling act has been enacted by the General Assembly and approved by the Governor; (b) an ordinance, exercising in part or in whole the enabling authority, has been passed by the Baltimore City Council and approved by the Mayor; (c) that ordinance has been submitted to and approved by the voters of Baltimore City; and (d) a capital funds appropriation for the project has been made in a duly adopted Ordinance of Estimates. When contracts have been entered for the construction of a project, the funds contracted to be paid are entered in the City's accounting records as 'encumbered.'

"During the period of time between contracting for the construction of a project and the sale of bonds authorized to be issued to pay the cost of construction of such project, contract payments have been made upon vouchers by checks drawn against the Cash Account. When the bonds have been sold, the net proceeds have been deposited in the Cash Account.

"The City's accounting system records receipts and expenditures by five funds: general, special, loan, revolving and motor vehicle revenue. The system also breaks down receipts and expenditures within the funds by programs or projects. Proceeds of the sale of City bonds are added to the City's Cash Account as loan funds and are credited to the balances of the individual loans for which the bonds were sold.

"As of January 31, 1969, the City had advanced from its Cash Account or encumbered $42,380,469.14, a substantial portion of which would be raised in the normal course of fiscal events through the sale of approximately $35,000,000 worth of bonds in the fall of 1969. If those bonds could not be sold because of limitations on the amount of interest which the City could legally pay the bondholders, the funds necessary to meet the City's contractual obligations for the various projects under construction would have to be raised through a substantial increase in the *ad valorem* tax rate.

"The City's obvious concern that the conditions of the municipal bond market might be such in the fall of 1969 that interest at a rate or rates in excess of 5% would have to be paid in order to attract even one bid for the City's bonds, has, to a degree, been confirmed by subsequent events. The Bond Buyer's 20-Bond Index, which is published at Thursday of each calendar week and shows the composite interest rate at which the 20 representative general obligation bond issues comprising the Index sold during the previous week, stood at 4.96 on February 6, 1969, immediately prior to the introduction of Senate Bill No. 381. On February 27, it went to 5.04. This was

the first date since 1934 at which the Index had stood above 5%. By March 13, the day before Senate Bill No. 381 was amended in the House, the Index had risen to 5.26. On May 22, it stood at 5.46. The all-time high for this Index is 5.69 on May 1, 1933.

"Since January 1, 1969, there have been nine sales of general obligation bonds of Maryland issuers in amounts exceeding $1,000,000 and rated "A" or better by Moody's. Four of those sales were held in January and were conditioned upon a 5% interest ceiling. In each of those sales the bidders bid a 5% coupon on one or more maturities. In the sales held since January, the bidding conditions have legally permitted in excess of 5% and the maximum coupon rate bid by the winning bidder has been 6% in four out of five sales so held. The most recent sale was held by Prince George's County, being $20,400,000 worth of "A"-rated bonds sold on May 14, at a net average interest cost of 5.337%.

"No Maryland issuer has recently held a public sale under bidding conditions which so restricted the rate of interest payable on the bonds that no bids were received for purchase of the bonds.

"Because of its fiscal policies, the City will sell a substantial principal amount of bonds this fall. It is anticipated that the amount will be in the neighborhood of $35,000,000. Whatever the amount, the bonds will be awarded to the highest bidder who, complying with the other conditions of sale, offers the lowest net interest cost to the City, regardless of what that interest cost may be. In the event that the rate or rates of interest payable on the bonds to be sold in the fall exceeds even 6% per annum, it is, nevertheless, the present intention of the City to sell the bonds.

"The plaintiff initially attacks the validity of Chapter 6 on the ground that an emergency did not in fact exist so as to justify passage of Chapter 6 as an emergency Bill. While the plaintiff's counsel have gone to great lengths to convince the Court that such a question is re-

viewable, this Court feels compelled to adopt the rule set out in *Gebhart v. Hill,* 189 Md. 135, 139 (1947), to the effect that the question whether an emergency in fact exists is for the Legislature, and its determination in that regard is final and not reviewable by the Courts. See also *Culp v. Commissioners of Chestertown,* 154 Md. 620, 623 (1928) and *First Continental Savings and Loan Association v. Director,* 229. Md. 293, 302 (1962). However, if a ruling were required on this matter, the Court would find that an 'emergency' did exist at the time of the passage of Chapter 6, justifying the removal of the 5% interest ceiling on the Baltimore City Bonds.

"The plaintiff next contends that S. B. 316 (enacted as Chapter 6) was ineffectively amended *into* an emergency bill in the House of Delegates in that there is no express provision of rule or law permitting a bill which has been passed by its House of origin as an ordinary bill to be amended in the opposite house into an emergency bill. Article III, Section 27, of the Constitution of Maryland states that 'Any bill may originate in either House of the General Assembly and be altered, amended or rejected by the other.' Rule 42 of the 1969 Regular Session Rules of the House of Delegates of Maryland provides in pertinent part:

'(b) No Amendment shall be received at the third reading of a House Bill or House Joint Resolution, but a *Bill or Joint Resolution originating in the Senate shall be open to amendment on third reading.* (Emphasis supplied)

\* \* \*

'(g) If a Bill is amended to require an extraordinary majority for enactment, one of the amendments shall direct the printer to print plainly either "Constitutional Amendment" or "Emergency Bill" as the case may be, on the first page of the amended Bill.'

"It is, therefore, apparent from the above-quoted provisions of the Maryland Constitution and of Rule 42 that

it was contemplated by the Legislature that a bill which originated in the Senate could be converted into an emergency bill in the House of Delegates. In any event, the general rule, as discussed in *Baltimore Fidelity Warehouse Company v. Canton Lumber Company*, 118 Md. 135, 149 (1912) is that each branch of the Legislature has the power to make its own rules, subject to the constitutional provisions, and may change and suspend its rules at will; and generally, courts will not inquire whether such rules have been complied with in the enactment of the statute.

"The plaintiff's final attack on Chapter 6 is based on Article 3, Section 57 of the Maryland Constitution, which provides:

'The Legal Rate of Interest shall be six per cent per annum; *unless otherwise provided by the General Assembly.*' (Emphasis supplied)

"The plaintiff seeks to declare that the bonds may not be sold at a coupon rate that exceeds 6 per cent per annum, for to do so would violate Article 3, Section 57. [Ch. 6 of the Laws of 1969 as amended provided simply that the bonds when issued by the City "shall bear interest at such rate or rates as may be provided by or under the authority of an ordinance or ordinances of the Mayor and City Council of Baltimore * * *." It further authorized a special election at which the voters of the City would adopt or reject "the limitation of the amount of interest" which the Mayor and City Council of Baltimore may pay on bonds previously authorized and to be issued. Ordinance 417 of the Mayor and City Council provided that the bonds "shall bear interest at such rate or rates * * * as may be determined by the Commissioners of Finance at the time of the issuance * * *."] Clearly, it was the intention of the General Assembly [(and the City Council and, inferentially, the voters)] not to impose any interest ceiling in connection with the sale of bonds authorized by said Acts. Otherwise, the General Assembly would have imposed a new interest ceiling on

the sale of the bonds authorized by said Acts when it removed the 5% interest rate limitation. Accordingly, the City is not limited to a net average interest rate or a coupon rate of 6%, as plaintiff contends, in connection with the sale of its bonds under the authority of Chapter 6 of the Laws of 1969, because the General Assembly has otherwise provided within the meaning of the above-quoted provisions of Article 3, Section 57, of the Constitution. [See Jones, *Bonds and Bond Securities*, 4th Edition, Vol. 1, Sec. 369 (1935) :

> "It is fairly to be presumed that when the Legislature authorizes municipal corporations, under specified conditions and procedures, to issue and sell their bonds, and in the enabling act omits any directions, provisions, or prohibitions as to the amount which such bonds shall bring, it intends to vest authority of disposal in the municipal officers, and to confine to their discretion the matter of making sales in such amounts as they shall deem best for the public interest."]

"The plaintiff also challenges the legality of the Special Referendum Election of May 13, 1969, claiming that the use of a master lever permitting the voters to vote FOR or AGAINST all 39 questions without casting individual ballots was illegal. All of the requirements of the State Election Laws found in Article 33 of the Maryland Code were complied with by the City. While no specific provision has been found in Article 33 of the Maryland Code authorizing the use of a master lever, none has been found prohibiting such use. There is no prohibition of any kind in the election laws of the State of Maryland against the utilization of a single master lever allowing voters to vote FOR or AGAINST an entire series of questions; so long as each voter is given the opportunity to vote for or against each individual question and each voter is given the opportunity to change his vote upon any question appearing upon the ballot up to the time he begins the final operation to register his vote.

See Article 33, Section 16-3(b) (4) and (7). The only reason the master lever was utilized in connection with the May 13 election, in addition to giving each voter the opportunity to vote for or against each individual question on the ballot, was to facilitate and expedite the voting process, due to the inordinate number of questions which were presented on the ballot, because of the necessity of voting for or against the removal of the interest rate limitation on 39 separate bond ordinances. It is clear to the Court that the Special Referendum Election on May 13, 1969, was not made illegal by the use of the master lever." [Further, see *Lexington Park v. Robidoux*, 218 Md. 195]

*Decree affirmed, with costs.*