## RONALD K. BROWN *v.* JOYCE A. BROWN

[No. 64, September Term, 1979.]

*Decided March 10, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Ellen D. Pattin,* with whom were *Thomas Fortune Fay* and *Fay, Donald & Sheehy* on the brief, for appellant.

*George E. Meng,* with whom were *Pitrof & Starkey* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

The appellant here challenges the use of incarceration for contempt to enforce a provision of a separation agreement, incorporated into a divorce and child custody decree, that obligated the husband to pay a specific amount of support for his stepdaughter, as violating the prohibition against imprisonment for debt contained in Article III, section 38 of the Maryland Constitution.

The parties to this dispute, Ronald K. Brown, appellant, and Joyce A. Brown, appellee, were divorced on October 22, 1976, by decree of the Circuit Court for Prince George's County. The decree incorporated a previously executed separation agreement which differs in a material way from most such contracts in only one respect. Its unusual aspect is contained in Paragraph 7, which states:

> The husband and wife acknowledge that a child, Lisa Graninger, age 6, was born to wife prior to the marriage of the parties. That despite the fact that the husband is not the natural father of Lisa, in consideration of his love for the child and other good and valuable consideration, the husband agrees to pay support to the wife for Lisa Graninger the sum of $30.00 per week . . . commencing on the 5th day of July, 1976, and to continue until [the] child becomes eighteen years of age, is emancipated or dies, whichever first occurs.[1]

While initially discharging his contractual obligation, the appellant soon fell into arrears in the agreed support payments for Lisa. Following a hearing as to whether he was in contempt of court for failing to make these payments, Judge Robert J. Woods, on October 17, 1978, found Mr. Brown to be in default in the amount of $1729.95, adjudged him to be in contempt of court, and subsequently sentenced

---

1. While technically the step relationship was terminated upon the parties' divorce, see *Webster's Third New International Dictionary* 2237 (2d unabr. ed. 1961), throughout this opinion we will frequently refer to Mr. Brown as stepfather and Lisa as stepdaughter.

the stepfather to serve a term of 179 days in jail. In support of his conclusion Judge Woods reasoned:

> [T]he contempt powers of the Circuit Court do pertain to Lisa under the unusual divorce decree of October 22, 1976, incorporating by reference paragraph 7 of the separation agreement.
>
> Contempt powers deal . . . with a far broader scope of cases than those that are just coupled with child support, contempt is the sanction for disobedience of a Court order. . . .
>
> * * *
>
> I think that . . . the constitutional provision of Art. 3, Section 38 of the Maryland Constitution does not state that dependent children must be children of the party taking upon himself the duty of support.

An appeal was noted from the imprisonment order to the Court of Special Appeals, but prior to its considering the matter, we granted certiorari to decide the important issue of the availability of imprisonment under the court's contempt power to enforce a contractual obligation incorporated into a divorce decree to support a child not his own.

The gravamen of the stepfather's claim of error — the court lacked power to imprison him for the breach of his promise to provide support for his stepdaughter — is based on Article III, section 38 of the Maryland Constitution which, since 1962, has provided:

> Imprisonment for debt.
>
> No person shall be imprisoned for debt, but a valid decree of a court of competent jurisdiction or agreement approved by decree of said court for the support of a wife or dependent children, or for the support of an illegitimate child or children, or for

alimony, shall not constitute a debt within the meaning of this section. [Md. Const., Art. III, § 38.[2]]

In attempting to cloak himself in the protection afforded by section 38, the stepfather reasons in this Court that there exists no legal duty, independent of agreement, to support his stepchild, and that his contractual assumption of the obligation to make the weekly payments for Lisa, being voluntary, cannot subject him to incarceration for his failure to pay. The appellant does not dispute, however, that his promise to pay can be enforced by means of an action of assumpsit or through some other appropriate remedy. On the other hand, the appellee argues that the relationship created between her ex-husband and his stepchild by the separation agreement was such that Lisa became a "dependent child" within the meaning of section 38, and therefore, the obligation of support is a duty of the appellant which can be enforced through use of the court's contempt power. Since the present dispute must be resolved by determining the scope of this constitutional provision, we initially review the time-honored guidelines developed by this Court to be utilized in construing constitutional language.

Generally speaking, the same rules that are applicable to the construction of statutory language are employed in interpreting constitutional verbiage, *Kadan v. Bd. of Sup. of Elections,* 273 Md. 406, 329 A.2d 702 (1974); *New Cent. Co. v. George's Creek Co.,* 37 Md. 537 (1873). Accordingly, it is axiomatic that the words used in the enactment should be given the construction that effectuates the intent of its framers, *see, e.g., Perkins v. Eskridge,* 278 Md. 619, 639, 366

---

2. The prohibition against imprisonment for debt was first enacted as section 44 of Article III of the Constitution of 1851, which became section 37 of the Constitution of 1864, and was finally enumerated, as it exists today, section 38 of Article III of the Constitution of 1867. For the first one hundred years of its existence, the provision simply read "No person shall be imprisoned for debt." In 1950 the section was amended by adding "but a valid decree of a court of competent jurisdiction or agreement approved by decree of said court for the support of a wife or dependent children, or for alimony, shall not constitute a debt within the meaning of this section." The section was further amended in 1962 by the addition of the language ", or for the support of an illegitimate child or children."

A.2d 21, 33 (1976); *Beall v. State,* 131 Md. 669, 676, 103 A. 99, 102 (1917); such intent is first sought from the terminology used in the provision, with each word being given its ordinary and popularly understood meaning, *e.g., Harbor Island Marina v. Calvert Co.,* 286 Md. 303, 311, 407 A.2d 738, 742 (1979); *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1095-96 (1979); and, if the words are not ambiguous, the inquiry is terminated, for the Court is not at liberty to search beyond the Constitution itself where the intention of the framers is clearly demonstrated by the phraseology utilized. *Reed v. McKeldin,* 207 Md. 553, 560-61, 115 A.2d 281, 285 (1955). If an examination of the language, however, demonstrates ambiguity or uncertainty, we look elsewhere to learn the provision's meaning, keeping in mind the necessity of ascertaining the purpose sought to be accomplished by enactment of the provision. In this regard we recently summarized the scope of the inquiry in *Perkins v. Eskridge* by quoting from *Reed v. McKeldin, supra,* 207 Md. at 560-61, 115 A.2d at 285:

> *[I]t is permissible to inquire into the prior state of the law, the previous and contemporary history of the people, the circumstances attending the adoption of the organic law, as well as broad considerations of expediency.* The object is to ascertain the reason which induced the framers to enact the provision in dispute and the purpose sought to be accomplished thereby, in order to construe the whole instrument in such way as to effect that purpose. The Court may avail itself of any light that may be derived from such sources, but it is not bound to adopt it as the sole ground of its decision. [*Perkins v. Eskridge, supra,* 278 Md. at 640-41, 366 A.2d at 34 (emphasis in original).]

Looking first to the historical background of section 38, we observe that, after its adoption to a degree into the English legal system from the early Roman Law of the Twelve Tables (451-50 B.C.), imprisonment for debt, and the struggles to curtail it, has had a long and somewhat erratic history both

in England and in this country. See V. Countryman, *Cases and Materials on Debtor and Creditor* 74-81 (1st ed. 1964); Ford, *Imprisonment for Debt,* 25 Mich. L. Rev. 24, 24-34 (1926); Freedman, *Imprisonment for Debt,* 2 Temp. L.Q. 330, 330-50 (1927). Despite the cruel and abusive nature of the practice as it existed in England under the early common law,[3] imprisonment for debtors was transferred to the American colonies, substantially intact. V. Countryman, *supra,* at 76-77. In Maryland the colonial Assembly early on recognized the existence of the writ of *capias ad satisfaciendum* by which a debtor was imprisoned where a judgment against him remained unsatisfied. 1715 Md. Laws, ch. 40. The growing sensibilities concerning the harshness and inequity of this imprisonment practice produced minor statutory reform in the Acts of 1820, ch. 186, which required the creditor to pay eighty-seven and one-half cents per week for the support of his imprisoned debtor, and the abolition of the practice as it applied to females by ch. 206 of the Acts of 1824. Imprisonment for debt, however, did not immediately abate to any substantial degree for it appears that as of 1830, three to five times as many persons were imprisoned for debt (3000 annually in Maryland) as were imprisoned for crime. Ford, *supra,* 25 Mich. L. Rev. at 29. Responding to a reform movement advocating the banning of such incarceration which pervaded this country in the second quarter of the nineteenth century, the Constitutional Convention of 1851 proposed its abolition which became a part of the organic law of this State with the inclusion of section 44 of Article III as part of the Maryland Constitution adopted in that year. The prohibition was absolute: "No person shall be imprisoned for debt."

The evident purpose of the framers was to abolish the useless, and sometimes cruel, imprisonment of persons who,

---

**3.** The barbarity of the early practice of imprisonment for debt is illustrated by the following statement: "If a man be taken in Execution and lie in prison for debt, neither the plaintiff at whose suit he is arrested, nor the Sheriff who took him, is bound to find him meat, drink, or clothes; but he must live on his own, or on the charity of others; and if no man will release him, let him die in the Name of God, says the Law; and so say I." Manby v. Scott, 1 Mod. 124, 132, 86 Eng. Rep. 781, 786 (Ex. 1659) (Hyde, J.).

having honestly become indebted to another, were unable to pay as promised.[4] *State v. Mace,* 5 Md. 337, 351 (1854). However, early in the development of the case law under this section, a distinction was drawn by this Court between a "debt" within the meaning of section 38, and a legal "duty" arising from or imposed by law. Thus in the very first case to reach this Court requiring an interpretation of that constitutional provision, the Court held that the term debt does not include fines or penalties levied against one who has been adjudged in violation of the public law. *State v. Mace, supra,* at 351-52. *See Ruggles v. State,* 120 Md. 553, 87 A. 1080 (1913) (imprisonment for failing to pay motor vehicle fine not violating this section). Similarly, in *State v. Nicholson,* 67 Md. 1, 8 A. 817 (1887), the next case reaching this Court involving section 38, where the defendant was indicted for the violation of a statute providing for imprisonment of defaulting tax collectors, this Court upheld the statute reasoning: "There is a broad distinction, however, between imprisonment for a debt within the meaning of the Constitution, and imprisonment for a breach of duty on the part of a public officer . . . ." *Id.* at 3, 8 A. at 818. This dichotomy between duty and debt was first applied in this State in a domestic relation context in *Dickey v. Dickey,* 154 Md. 675, 141 A. 387 (1928) where the Court, in an opinion penned by Judge Parke, said:

---

4. The record pertaining to the proceedings of the 1851 Constitutional Convention discloses that little discussion took place relative to the scope of the evil sought to be eradicated. In summary form, the record of the proceedings discloses: The prohibition of imprisonment for debt was introduced on the floor of the 1851 Constitutional Convention by Mr. Benjamin C. Presstman of Baltimore City. There was no debate concerning the provision because, in Mr. Presstman's words, "gentlemen, whether in favor of the abolition of imprisonment for debt, or opposed to it, will scarcely be influenced by any discussion here . . . [since it is] a subject which is so well understood." I *Debates and Proceedings of the Maryland Reform Convention to Revise the State Constitution* 446-47 (Mar. 7, 1851). However, over a month later, when an attempt was made to reconsider and remove the prohibition from the new constitution, Mr. William C. Johnson of Frederick County stated in opposition to such a move that "[h]e trusted that at this enlightened day the members of the Convention would rejoice at what they had done, by striking out that barbarous feature which existed heretofore in our institutions. . . . In what the Convention had done, it showed that they had acted with humanity, and would say to the unfortunate, 'we sympathize with and will not aid, by any act of ours, to add to the bolts and bars of your prison house.' " II *Id.,* at 607 (Apr. 28, 1851).

> [T]he obligation to pay alimony in a divorce proceeding is not regarded as a debt but a duty growing out of the marital relation and resting upon a sound public policy, and so this obligation may be enforced by attachment of the person for contempt, and the defendant be imprisoned . . . . [*Id.* at 681, 141 A. at 390.]

On the other hand, wife support, contractually assented to upon dissolution of the marriage, not being founded on a legal duty as is strict alimony, was not afforded a similar status. *Id.*[5] Just one year later, however, this Court, for reasons which to us are not now readily apparent, held, also in an opinion by Judge Parke, that child support, which only two years earlier had been determined to be a common law duty of the father, *Blades v. Szatai,* 151 Md. 644, 647, 135 A. 841, 842 (1927), was an obligation in the nature of a debt within the meaning of the constitutional imprisonment prohibition, so that failure of the father to comply with child support provisions of a decree could not subject him to imprisonment.[6] *Bushman v. Bushman,* 157 Md. 166, 145 A. 488 (1929). *See also Knabe v. Knabe,* 176 Md. 606, 617-18, 6 A.2d 366, 371 (1939).

The status of the law as interpreted by the decisions of this Court in the domestic relations area was materially changed by the adoption in 1950 and 1962 of amendments to section 38, which defined "debt" as not including "a valid decree of a court of competent jurisdiction or agreement approved by decree of said court for the support of a wife or *dependent children,* or for the support of an illegitimate child or

---

**5.** For other decisions of this Court which discuss strict alimony as being a legal duty resulting from the marital tie, *see* Speckler v. Speckler, 256 Md. 635, 636-37, 261 A.2d 466, 467 (1970); McCabe v. McCabe, 210 Md. 308, 314, 123 A.2d 447, 450 (1955); Oles Envelope Corp. v. Oles, 193 Md. 79, 92, 65 A.2d 899, 905 (1949).

**6.** The majority of our sister states draw no distinction between alimony and child support for purposes of a constitutional prohibition against imprisonment for debt, *see, e.g.,* Application of Martin, 76 Idaho 179, 279 P.2d 873 (1955); Lear v. Lear, 29 Wash. 2d 692, 189 P.2d 237 (1948), and the 1929 position taken by this Court has been criticized as creating an "inexplicable" distinction. *See* H. Clark, *The Law of Domestic Relations in the United States* 507-08 (1968). See, however, Md. Const., Art. III, § 38, as amended in 1950.

children, or for alimony . . . ." (Emphasis supplied.) These amendments abolished the longstanding technical distinctions between alimony on the one hand, and wife support and the support of dependent children, on the other, so that all three obligations now purport to be enforceable by attachment and imprisonment of the defendant. *See Speckler v. Speckler,* 256 Md. 635, 637, 261 A.2d 466, 467 (1970); *Johnson v. Johnson,* 241 Md. 416, 419, 216 A.2d 914, 916 (1966). Furthermore, an agreement for support or alimony which is approved by a court of competent jurisdiction, is equated to a decree of such court, so that neither is a debt within the contemplation of the constitutional prohibition against imprisonment for nonpayment. *Zouck v. Zouck,* 204 Md. 285, 300, 104 A.2d 573, 580 (1954). Finally, the 1962 amendment brought within the scope of the exception to the general prohibition against imprisonment for a debt an obligation to support one's illegitimate child.[7] With this historical background, we now approach a consideration of the prohibition against imprisonment for debt as it applies in the factual context before us. Specifically, we address the issue whether Lisa, being not the natural daughter of the appellant, but only his stepdaughter, is a *dependent child* within the meaning of section 38 so that an agreement incorporated into a divorce decree to pay a weekly stipend for her maintenance can, upon default, result in imprisonment as a contempt of court.

We begin our discussion of this issue by observing that we cannot detect, from any source, an intention on the part of the General Assembly, as the framers of the 1950 amendment, to expand the noncontractual duty of support owed by adults to minors. In interpreting the phrase "dependent children," we are guided by what this Court said well over a century ago in a similar context: "We think the Constitution ought to have a common sense interpretation,

---

7. The 1962 constitutional amendment was enacted as part of the broader legislative plan involving the repeal of the criminal bastardy laws, and the creation of a civil proceeding in equity for the determination of paternity and the enforcement of decrees passed in connection therewith. Md. Code (1957, 1973 Repl. Vol., 1979 Cum. Supp.), Art. 16, §§ 66A-66P. *See* Corley v. Moore, 236 Md. 241, 242, 203 A.2d 697, 697-98 (1964).

by which we mean the sense in which it was understood by those who adopted it . . . ." *State v. Mace, supra,* 5 Md. at 350. It seems patently clear to us that what was sought to be, and actually was, accomplished by the amendment was permission to enforce by imprisonment, if need be, the *legal* and *moral* obligation of support (when expressed in an equity decree) that parents owe to their own children. *Cf. Stone v. Stidham,* 96 Ariz. 235, 393 P.2d 923, 925 (1964) (en banc) (child support and alimony based on moral and social obligation and is not a debt). Indeed, since the primary purpose of the original enactment of section 38's imprisonment prohibition was to safeguard personal liberty, we believe that, in the absence of a clear indication of an intent to abridge the broad scope of this protection, any doubts concerning the class of children whose support the framers intended could be enforced by imprisonment, should be resolved in favor of the liberty of the citizen. *Accord, e.g., Stone v. Stidham, supra,* 393 P.2d at 925; *Tudor v. Firebaugh,* 364 Ill. 283, 4 N.E.2d 393, 395 (1936); 16A Am. Jur. 2d, *Constitutional Law* § 619, at 569-70 (2d ed. 1979). In our view, the modifying word "dependent" in the phrase "dependent children" does not, as urged by appellee, broaden the class of children which section 38's exception provision was meant to include. Rather, it results from recognition by the amendment's framers that there may be a natural child of a parent: 1) who, although still a minor, requires no support from that parent because the infant is emancipated or possesses sufficient means so as not to require parental supplementation, or 2) who, although an adult, is legally dependent upon that parent for care and sustenance because he is incompetent, or otherwise incapable of caring and providing for himself. In sum, "dependent child," in the context of this constitutional provision, is one who is entitled to support by virtue of a legal duty from another to provide it, independent of contract, without regard to whether the provisions of that agreement are incorporated into a judicial decree. That the legal duty to support does not ordinarily encompass a stepchild is beyond doubt, and the authorities are legion to that effect. *See, e.g., Harrington v. Harrington,* 145 A.2d 121 (D.C. Mun. App. 1958); *Falzo v. Falzo,* 84 N.J.

Super. 343, 202 A.2d 192 (1964); H. Clark, *The Law of Domestic Relations in the United States* § 6.2 (1968); 2 W. Nelson, *Divorce and Annulment* § 14.80 (2d rev. ed. 1961). And this is for good reason, for the foundation upon which the law imposes a duty of support upon parents does not similarly justify such a duty being placed upon stepparents. Long ago, it was said

> [t]he duty of parents to provide for the maintenance of their children, is a principle of natural law; an obligation laid on them not only by nature herself, but by their own proper act, in bringing them into the world: ... By begetting them, therefore, they have entered into a voluntary obligation to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved. [1 W. Blackstone, *Commentaries on the Laws of England* 447 (Christian ed., Phila. 1854).]

Placed in this context, the obligation of the appellant here to support his stepchild is contractual, and consequently quite different from a father's noncontractual duty to support his natural or adopted child. The 1950 and 1962 amendments to section 38 do not address obligations such as the one entered into by the appellant, with the consequence that his agreement to aid in the support of his stepdaughter created nothing more than a debt for which the constitution affords him immunity from incarceration when he failed to discharge his contractual obligation.

That the interpretation of section 38 which we have just expressed is consistent with the intention of the framers is buttressed by at least four factors. First, it has long been established that the "popular conception of the meaning of the words 'child or children' [of specific individuals] is 'immediate offspring.'" *Billingsley v. Bradley,* 166 Md. 412, 419, 171 A. 351, 354 (1934). *See Ryan v. Herbert,* 186 Md. 453, 461, 47 A.2d 360, 364 (1946); *Webster's Third New International Dictionary* 388 (2d unabr. ed. 1961). Second, it has been stated that the word child "has two meanings in law: (1) In the law of . . . domestic relations, and as to descent

and distribution, it is used strictly as the correlative of 'parent,' and means a son or daughter . . . [; while] (2) In the law of negligence, and in laws for the protection of children, etc., it is used as the opposite of 'adult' . . . ." *Black's Law Dictionary* 320 (3d ed. 1933). *See also Albright v. Albright,* 116 Oh. St. 668, 157 N.E. 760, 763 (1927); *Meisner v. United States,* 295 F. 866, 868 (W.D. Mo. 1924). Since the language we now consider can only arise in a domestic relations context, the interpretation we here place on the word "child" is consistent with these alternative legal definitions. *See New York Life Ins. Co. v. Beebe,* 57 F. Supp. 754, 757 (D. Md. 1944). Third, if the appellee's contention were correct — that the word "children" should be accorded a broad definition that could encompass stepchildren — we can see no reason why the phrase "or for the support of an illegitimate child or children" was, or need be, added to the constitutional provision, for illegitimate children would unquestionably come within the scope of "dependent children" so defined. A well recognized canon of constitutional interpretation is that the construction that renders every word operative, rather than one which may make some idle and nugatory, is to be preferred. *Reed v. McKeldin,* 207 Md. 553, 561, 115 A.2d 281, 285 (1955); *Groome v. Gwinn,* 43 Md. 572, 624 (1876). Finally, when the legislature intends that the word "child" have other than its ordinary meaning, it generally defines explicitly the scope of the word as so used. *See, e.g.,* Md. Code (1959, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 27, § 35A (child abuse); Md. Code (1957, 1979 Repl. Vol.), Art. 88A, § 45 (Aid to Families with Dependent Children).

The appellee urges, however, that the stepfather stands *in loco parentis* to Lisa, and that thus there is, by the existence of that relationship, a legal duty of support owed by Mr. Brown for his stepdaughter sufficient to authorize the chancellor's action here. Assuming that such a relationship existed,[8] no more than a minimal comment concerning this

---

8. The mere agreement by an adult to pay money to or for a minor does not, without more, create an *in loco parentis* relationship, *see* Von der Horst v. Von der Horst, 88 Md. 127, 130-31, 41 A. 124, 126 (1898). In this regard, we point out that the agreement to support Lisa here was entered into after the family unit had ceased to exist and shortly before the divorce proceeding between the parties was instituted.

contention is required. It suffices to say that any obligation between a child and one standing in place of a parent is necessarily not one owed by a parent to his own child, and therefore, in accord with our discussion above, not a duty owed to a "dependent child" within the purview of the 1950 amendment to section 38.

The final point we address, although not discussed by the parties, is one that appears in the rationale utilized by the circuit court judge in reaching his conclusion that imprisonment for contempt is authorized generally to enforce the mandates of a court in an equity action. The chancellor reasoned that, whether Mr. Brown's agreement to contribute to Lisa's support is technically a debt within the scope of section 38, imprisonment as a contempt is available by virtue of the appellant's disregard of a direct order by the court to pay. This Court has, on several occasions in the past, reviewed the nature, attributes and use of imprisonment through contempt proceedings: (i) "to vindicate the authority and power of the court and punish disobedience to its orders," which constitutes criminal contempt; and (ii) "to preserve and enforce the rights of private parties to a suit and to compel obedience to orders and decrees primarily made to benefit such parties," which constitutes civil contempt. *State v. Roll and Scholl,* 267 Md. 714, 727-28, 298 A.2d 867, 875-76 (1973). See also, *e.g., Giant of Md. v. State's Attorney,* 274 Md. 158, 334 A.2d 107 (1975); *McDaniel v. McDaniel,* 256 Md. 684, 262 A.2d 52 (1970). While we recognize that there is, in some of our sister states, authority to the contrary,[9] the decisions of this Court make clear that although there are

> various [other] remedies at the command of chancery for the purpose of executing or compelling the performance and fulfillment of a decree[,] . . . when the decree only directs the payment of money, a party defendant, who has been brought into court

___

**9.** *See, e.g.,* Harrison v. Harrison, 239 Ark. 756, 394 S.W.2d 128, 130 (1965); In re Clift's Estate, 108 Utah 336, 159 P.2d 872, 876 (1945); Wisconsin Employment Relations Board v. Mews, 29 Wis.2d 44, 138 N.W.2d 147, 150-51 (1965).

under process of contempt to compel the performance of such a decree, may not be imprisoned. [*Dickey v. Dickey, supra,* 154 Md. at 681, 141 A. at 390.]

See also, *Yake v. Yake,* 170 Md. 75, 78, 183 A. 555, 556-57 (1935); *Bushman v. Bushman,* 157 Md. 166, 170, 145 A. 488, 492 (1929); Md. Rule 675; C. Phelps *Juridical Equity* § 124, at 160-61 (1894). Our conclusion that incarceration is not an available remedy for the enforcement of money decrees is bolstered by the fact that the amendments in 1950 and 1962 to section 38 would have accomplished no change, and would have granted the equity court no new power, if the chancellor already had in his enforcement arsenal, upon the disobeyance of an order directing the payment of money, the power to imprison for contempt. Mention is made of this because it is inconceivable that the framers of these amendments merely intended to add surplusage to the Constitution. Furthermore, in order to be consistent, the constitutional enactment in 1851 prohibiting imprisonment for debt, if Judge Woods' conclusion were correct, would have applied only to law actions and not those cognizable in equity. Implicit in our prior decisions is the proposition that section 38 has application to both law and equity actions, for otherwise the extensive analysis in *Dickey v. Dickey, supra,* as well as the distinction developed in *Bushman v. Bushman, supra,* would have been unnecessary. In addition, section 38, as amended in 1950, itself refers, in its exception to the normal definition of debt, to "a valid *decree* of a court of competent jurisdiction," a reference that established that the framers understood by their use of the equity term "decree" that ordinarily the section would apply in equity actions. Finally, a limitation on the exercise of the contempt power, where the decree only directed payment of money, has long been recognized in the statute outlining the mechanisms available to a court of equity to enforce its decrees and orders. Md. Code (1951), Art. 16, § 222. Since it was first enacted as Article 16, section 118 in the Code of 1860, the statutory enumeration of the powers of a court of equity to enforce its decrees contained a concluding sentence

which read: "but where the decree only·directs the payment of money, no defendant shall be imprisoned, and process of commission of rebellion and sergeant-at-arms are abolished." Furthermore, we think that there is some significance in the fact that when that statute was repealed in 1957 upon it being superseded by Md. Rule 685, the Rule, with minor stylistic changes, tracked the statute's wording, except that it deleted the just quoted provision as being surplusage in light of the constitutional provision. We conclude for all the foregoing reasons that the constitutional prohibition against imprisonment for debt is, in the proper circumstances, such as those here, applicable to decrees and orders of an equity court.[10]

We hasten to add that this conclusion will not unnecessarily hamper the equity court in enforcement of its decrees. Chancellors have a wide array of enforcement tools available for use by virtue of Rule 685, and this opinion should not be read as a disparagement of the employment of those powers in this, or any other case where they are appropriate.

Consequently, we reverse the decree of the Circuit Court for Prince George's County sentencing the appellant to serve a prison term, and remand the case to that court for the entry of a money decree and for such further action as may be appropriate in accord with the views here expressed.

> *Order of the Circuit Court for Prince George's County sentencing Ronald K. Brown to serve a term of 179 days imprisonment reversed, and case remanded to that court for the entry of a money decree and appropriate further proceedings, if required, not contrary to the views expressed in this opinion.*
> *Costs to be paid by appellee.*

---

**10.** Whether the imprisonment order here was intended as a remedy for civil or criminal contempt, or whether the procedures utilized resulting in

---

the order of confinement were proper, are issues raised by neither party. In light of the fact that we are voiding the imprisonment order on other grounds, we do not consider these possible questions.