650 A.2d 705

**FISH MARKET NOMINEE CORPORATION**

v.

**G.A.A., INC. et al.**

**No. 36, Sept. Term, 1994.**

Court of Appeals of Maryland.

Dec. 16, 1994.

Eugene Hettleman, Baltimore, for petitioner.

Arnold M. Weiner (Allan P. Hillman, Weiner, Astrachan, Gunst Hillman & Allen, P.C., Henry R. Abrams, Weinberg and Green, Otho M. Thompson, Carolyn A. Espy, Michael G. Raimondi, all on brief), Baltimore, for respondent.

Andrew H. Baida, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for amicus curiae.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

**4**

MURPHY, Chief Judge.

This case concerns whether Maryland's General Assembly may properly authorize Baltimore City to set the redemption interest rate on a tax sale of real estate at a rate greater than the 6% rate provided in Article III, § 57 of the Maryland Constitution.[1] We must also determine whether a circuit court, in a proceeding to foreclose the rights of redemption in two properties, can substitute the assignee of only one of the two tax sale certificates so that two plaintiffs, rather than one, are parties in the case.

I

Sections 14–808 through 14–854 of the Tax–Property Article of the Maryland Code (1985, 1994 Repl.Vol.) outline the procedure for tax sales of real estate. When taxes are in arrears on a property, the tax collector, after complying with various notice provisions, sells the property at public auction to satisfy the taxes. §§ 14–808, 14–817. The purchaser, no later than the day after the sale, must pay all taxes due on the property, plus any interest, penalties, and sale expenses. § 14–818. The remainder of the purchase price "remains on credit." *Id.* The purchaser then receives a certificate of sale, which is freely assignable. §§ 14–820, 14–821. If the purchaser assigns the certificate, the assignee has "all the right, title, and interest of the original purchaser." § 14–821.[2]

After the tax sale, the property owner has a right of redemption, which lasts until it is foreclosed in a court proceeding. § 14–827. In order to redeem the property, the owner must pay the collector, among other things, the amount already paid by the purchaser at the tax sale, plus interest at the applicable rate provided in § 14–820(b) from the date of

---

1. This section states: "The Legal Rate of Interest shall be *Six per cent. per annum;* unless otherwise provided by the General Assembly."

2. The purchaser or assignee becomes the holder of the tax sale certificate and will hereinafter be referred to as the "holder."

the tax sale to the date of redemption. § 14–828.[3] If the property is redeemed, the holder, upon surrendering the certificate, receives the redemption amount paid to the collector, excluding taxes. *Id.*

Section 14–820(b) provides that the redemption interest rate is the rate set by the local subdivision or, if none is set by the subdivision, the rate specified in § 14–820(b) for each subdivision. Local subdivisions often set the rate higher than rates given on ordinary investments. For example, Baltimore City has set the redemption interest rate at 24% per year. Baltimore City Code (1977, 1983 Repl.Vol, 1993 Supp.) Art. 28, § 16.[4] This high rate of return encourages potential tax sale purchasers to invest in the property despite the fact that the property is subject to a right of redemption.[5]

After waiting six months from the date of the tax sale, the holder can file a complaint to foreclose the owner's right of redemption. § 14–833. If the certificate holder does not file such a complaint within two years of the tax sale, the certificate becomes void, effectively placing a statute of limitations on actions to foreclose the right of redemption.

A special joinder provision for these actions states:

"Any single holder of certificates of sale relating to several properties in the same county may include and join in 1 proceeding any number of the certificates. However, if more than 1 property owner is involved, a maximum of 10

---

**3.** The owner must also pay taxes, interest, and penalties either paid by the holder or accrued after the date of the tax sale, together with expenses for which "the holder of a certificate of sale is entitled to reimbursement under § 14–843." § 14–828(a).

**4.** This section states in relevant part: "[T]he interest rate applicable to redemptions of property from tax sales in Baltimore City shall be 24% per annum."

**5.** In a March 19, 1983, memorandum to the Baltimore City Council, Edward J. Gallagher, then Chief of the Baltimore City Bureau of Budget and Management Research, explained: "The uncertainties and complexities of Tax Sale procedures warrant a higher rate of return to the investor than can be obtained through Certificates of Deposit or other forms of investments."

certificates may be joined in 1 proceeding. The complaint filed in any proceeding is not subject to objection on the ground of multifariousness." § 14–841.

After the holder files a complaint, the court issues summonses to all defendants and an order to publicize the foreclosure proceeding. §§ 14–839, 14–840. Both the summonses and the publication state a date, no sooner than 60 days from the date of the publication order, by which anyone having an interest in the property must redeem it. § 14–840. The right of redemption continues throughout the proceeding until the court issues a final decree foreclosing the right of redemption. § 14–827. While the complaint alleges an amount necessary for redemption, the court fixes the amount if it is disputed. §§ 14–829, 14–835(a)(7).

Generally, if the owner does not redeem the property by the dates stated in the summons and the publication, the court issues a final decree foreclosing the right of redemption. § 14–844(a). Thereafter, if the holder pays the balance of the purchase price and any other amounts due, the tax collector executes and delivers a deed to the holder. § 14–818.

## II

Petitioner Fish Market Nominee Corporation (Fish Market) owned two properties, 35 Market Place and 43 Market Place, located in Baltimore City, Maryland. Together, the properties are commonly known as the Fish Market. The building structure is designated 35 Market Place, while the air rights to the enclosed atrium above the structure are designated 43 Market Place.

Fish Market did not pay real estate taxes owed to the City of Baltimore on the two properties, resulting in tax arrearages of more than $640,000. On May 13, 1991, both properties were sold at tax sales to Hamilton II, a general partnership—35 Market Place for $700,000 and 43 Market Place for $70,000. Hamilton II paid the taxes and municipal liens due on the property—approximately $633,000 for 35 Market Place and

approximately $8,000 for 43 Market Place. On May 14, 1991, the City issued tax sale certificates to Hamilton II. On December 18, 1992, Hamilton II assigned both tax sale certificates to G.A.A., Inc. (GAA).

On January 13, 1993, more than six months after the tax sale, GAA filed a complaint in the Circuit Court for Baltimore City to foreclose the rights of redemption in both properties. On July 23, 1993, with the foreclosure proceedings pending, GAA assigned its interest in the certificate covering 43 Market Place to H.N.R.G., Inc. (HNRG). On August 10, 1993, GAA moved to substitute HNRG for itself as to the tax sale certificate covering 43 Market Place. The court granted the substitution. Fish Market, on August 19, 1993, filed a motion for reconsideration and for an order striking the substitution.

On December 6, 1993, the court held a hearing to determine the amount required for redemption, at which it also heard arguments on the substitution issue. Fish Market argued that the substitution of HNRG was improper because it resulted in a single proceeding with two plaintiffs, which is not permitted under § 14–841 of the Tax–Property Article, authorizing proceedings involving multiple properties. It also challenged the 24% interest rate, arguing that the General Assembly could not delegate to Baltimore City the power to fix the rate.

The court rejected both the substitution argument and the interest rate challenge. On December 7, 1993, the court issued an order setting the redemption prices for both properties, including interest at 24%. On March 31, 1994, the court entered final decrees that foreclosed the right of redemption in both properties and directed the collector to execute deeds to GAA and HNRG upon their payment of the remaining sums due on the properties. Fish Market appealed to the Court of Special Appeals, but, before that court heard the case, we granted certiorari to consider the important issues there raised. 335 Md. 225, 642 A.2d 1357.

### III

 Fish Market argues that the General Assembly cannot delegate to Baltimore City the authority to set the redemption interest rate. It asserts that the redemption interest rate should be 6%, pursuant to Article III, § 57 of the Maryland Constitution, which fixes the legal rate of interest at 6% "unless otherwise provided by the General Assembly." Fish Market argues that the General Assembly cannot "otherwise provide" unless the members "themselves stand up and make that change." In other words, Fish Market asserts that the General Assembly must specifically designate the percentage. Accordingly, it contends that the General Assembly cannot validly provide that the redemption interest rate in Baltimore City is the rate "fixed by a law of the City Council." *See* § 14–820 of the Tax–Property Article.

 We must first determine the meaning of the words "unless otherwise provided by the General Assembly." Generally, we apply the same principles in construing constitutional provisions as we apply in construing statutory language. *Brown v. Brown,* 287 Md. 273, 277, 412 A.2d 396 (1980). We have stated that "the cardinal rule of statutory interpretation is to ascertain and effectuate legislative intent." *Parrison v. State,* 335 Md. 554, 559, 644 A.2d 537 (1994). In applying this rule to constitutional provisions, we seek "the construction that effectuates the intent of its framers." *Brown, supra,* 287 Md. at 277, 412 A.2d 396. To determine intent, we first examine the language of the provision, "with each word being given its ordinary and popularly understood meaning." *Id.* at 278, 412 A.2d 396. If the words are not ambiguous, we generally construe the provision to effectuate the clear meaning expressed by its words. If the words are ambiguous, however, we look to other sources to determine the purpose for which the framers included the provision. In this regard, we have stated:

> " '[I]t is permissible to inquire into the prior state of the law, the previous and contemporary history of the people, the circumstances attending the adoption of the organic

*law, as well as broad considerations of expediency.* The object is to ascertain the reason which induced the framers to enact the provision in dispute and the purpose sought to be accomplished thereby, in order to construe the whole instrument in such way as to effect that purpose. The Court may avail itself of any light that may be derived from such sources, but it is not bound to adopt it as the sole ground of its decision.' "

*Id.* (quoting *Perkins v. Eskridge,* 278 Md. 619, 640–41, 366 A.2d 21, 33 (1976)) (emphasis in *Perkins* ).

■ The words "unless otherwise provided by the General Assembly," contained in Article III, § 57, are capable of two different interpretations. The first, advanced by GAA, is that the General Assembly may provide for a different interest rate by any means, including delegating the ability to set rates to local subdivisions. The second, advanced by Fish Market, is that the General Assembly may provide for a different interest rate only by itself enacting a law that sets a different rate.

This ambiguity requires that we examine other sources for guidance. We did so in *Carozza v. Federal Finance Co.,* 149 Md. 223, 131 A. 332 (1925), where we compared interest rate provisions in previous constitutions with § 57 of our present constitution. Previous constitutions had read: " '[T]he rate of interest in this State shall not exceed six per cent. per annum and no higher rate shall be taken or demanded, and the Legislature shall provide by law all necessary forfeitures and penalties against usury.' " *Id.* at 244–45, 131 A. 332 (quoting Art. 44, § 49 (1851) and Art. 3, § 60 (1864)). We observed that the former provision "was an express denial of any statutory authorization of a rate in excess of six per centum yearly," and noted that in the present Constitution, there is "no such inhibition upon legislative discretion." *Id.* at 245, 131 A. 332. We proclaimed the current provision to be "a radical change of public policy." *Id.* This profound policy shift indicated to us that the new provision (§ 57) "is a declaration which at once proclaims the lawful rate and confers upon the

**10**

General Assembly ample power to change that rate and its incidence *in any manner* and at any time *within the limitations of other constitutional provisions.*" *Id.* (emphasis added). The policy shift further led us to conclude that the power granted to the General Assembly in § 57 was of a "plenary and unrestricted nature." *Id.* at 247, 131 A. 332. Therefore, we refused to "assent to any other limitation being introduced into the Constitution by judicial construction."[6] *Id.*

█ Accordingly, in *Heaton v. City of Baltimore,* 254 Md. 605, 255 A.2d 310 (1969), we upheld a statute in which the General Assembly had delegated to Baltimore City the power to set interest rates on bonds. The General Assembly had provided that "the bonds when issued by the City 'shall bear interest at such rate or rates as may be provided by or under the authority of an ordinance or ordinances of the Mayor and City Council of Baltimore * * *.'" *Id.* at 613, 255 A.2d 310 (quoting Ch. 6 of the Acts of 1969). We said of this enactment that "the General Assembly has otherwise provided within the meaning of the above quoted provisions of Article 3, Section 57 of the Constitution." *Id.* at 614, 255 A.2d 310. Fish Market has attempted to distinguish *Heaton,* arguing that it involved a delegation of rate-setting power to Baltimore City, not only as a government entity, but also as a party to the loan transaction. Nevertheless, the case clearly supports the constitutional authority of the General Assembly to delegate rate-setting power, rather than itself setting the rate. We conclude, therefore, that the Legislature's ability to otherwise provide is unrestricted. It permits the Legislature to delegate to local subdivisions the power to set interest rates so long as

---

6. The one limitation imposed by this Court is that the rate can not be changed by special law, applicable only to an arbitrary class of persons. *Id.; Citizens Security and L. Co. v. Uhler,* 48 Md. 455 (1878). Although in *Citizens,* we used some language indicating that interest rates must be changed by general law (not local), we never so held, nor do we see any reason to so hold. Nonetheless, § 14–820 of the Tax–Property Article is a general law in that it delegates the same power to each of Maryland's local subdivisions. To be a general law, a statute need only apply to two or more local subdivisions. *E.g.,* Maryland Constitution, Art. XI–A, § 4.

the delegation does not violate provisions of the state or federal constitutions.

Fish Market recognizes that this Court has approved the State's delegation of its police powers to local political subdivisions. *See, e.g., Bender v. Arundel Arena,* 248 Md. 181, 195, 236 A.2d 7 (1967); *Stevens v. City of Salisbury,* 240 Md. 556, 564, 214 A.2d 775 (1965); *LaRoque v. Co. Commissioners,* 233 Md. 329, 335, 196 A.2d 902 (1964). It says, however, that the delegation of rate setting authority to a political subdivision is not an exercise of the State's police power. As to this, Fish Market maintains that the General Assembly is not authorized by Article III, § 57 of the Maryland Constitution to abdicate its law-making function to Baltimore City to enact the ordinance which transcends local concerns and impacts on matters of statewide concern well beyond the city's borders.

We said in *Maryland State Police v. Warwick,* 330 Md. 474, 480, 624 A.2d 1238 (1993), that a legislative body may not delegate "its law-making function to any other branch of government or entity." In *Pressman v. Barnes,* 209 Md. 544, 552, 121 A.2d 816 (1956), we said that the delegation doctrine "is not violated ... where a municipal corporation is vested with powers of legislation as to matters of local concern." Likewise, long ago in *Bradshaw v. Lankford,* 73 Md. 428, 430, 21 A. 66 (1891), we said: "No one questions the power of the Legislature to charter municipal corporations, and to confer upon such corporations the power to pass laws and ordinances in regard to matters pertaining to local legislation." These statements concerning delegation to municipal corporations are equally applicable when considering delegations to local subdivisions.

Applying this standard to the case before us, we conclude that setting the redemption interest rate for properties within Baltimore City is a matter of local concern. Fish Market argues to the contrary, asserting that the amount of the interest rate is a matter of more than local concern because it affects persons who are not residents of Baltimore City. Non-

residents are affected, Fish Market argues, because persons need not reside in Baltimore City to own or purchase property there. In making this argument, Fish Market relies on a series of cases in which, "while the immediate objective sought to be achieved was local in character, the statutes indirectly affected matters of significant interest to the entire state: *i.e.,* regulation of elections, control of natural resources, and protection of state revenues derived from licenses." *Cole v. Secretary of State,* 249 Md. 425, 435, 240 A.2d 272 (1968).

In contrast, when we have reviewed local legislation concerning matters not of significance to the entire state, we have consistently held that such legislation is not made general by some limited, indirect effect outside the local subdivision. In *Steuart Petroleum Co. v. Board,* 276 Md. 435, 446, 347 A.2d 854 (1975), we said that "nothing could be more local in scope than legislation affecting land use in a single county, irrespective of the fact that it could be contended that adjacent counties were indirectly affected." In *Steimel v. Board,* 278 Md. 1, 357 A.2d 386 (1976), we held a law repealing Sunday closing restrictions in Prince George's County to be a local law. We reasoned that the law, "in subject matter and substance, is confined in its operation to prescribed territorial limits and is equally applicable to all persons within [the county]." *Id.* at 5, 357 A.2d 386. Further, we said that the law "is of no significant interest beyond the boundaries of [the county]." *Id.* We held the law to be local despite its obvious effects on non-residents who either own businesses or shop in Prince George's County.

In the case before us, any possible effects outside Baltimore City are insufficient to cause the City's redemption interest rate to become a matter of significant interest to the entire state. The fact that Baltimore City's redemption interest rate ordinance affects a non-resident owner or purchaser of real estate does not make the ordinance general in scope. It applies to tax sales of property only within Baltimore City and is, therefore, local. Accordingly, we hold that Baltimore City's redemption interest rate ordinance was properly enacted pursuant to the enabling authority contained in Article III, § 57

of the Maryland Constitution and the implementing statute enacted by the General Assembly.

## IV

█ Fish Market contends that the substitution of HNRG for GAA as to 43 Market Place was improper because it created a misjoinder of plaintiffs by allowing both HNRG and GAA to be plaintiffs in the case with respect to different properties. Fish Market further contends that, as a remedy for this asserted error, the court should have dropped HNRG from the proceeding and dismissed the portion of the complaint dealing with 43 Market Place. HNRG, Fish Market reasons, would then be barred from refiling because the two year statute of limitations has passed.[7]

Assuming without deciding that the substitution of HNRG created a misjoinder, the rules do not require dismissal of the claim advanced by the misjoined plaintiff. Rather, the rules permit the court to sever the claims into two proceedings. *See* Maryland Rule 2–213 ("Any claim against a party may be severed and proceeded with separately."). Indeed, the court should not have dismissed the 43 Market Place claim because the possibility of dismissal under these circumstances would severely limit the ability of a certificate holder to assign the certificate after the statute of limitations has passed. We believe such a limitation would be inconsistent with § 14–821, which freely permits assignments of tax sale certificates. Accordingly, we conclude that, although courts normally have discretion in correcting misjoinder, the circuit court judge in this case could not have dismissed the 43 Market Place claim; his only option was to sever the claims.

---

7. As we explained earlier, the holder of a tax sale certificate has two years from the date of the tax sale in which to file a complaint to foreclose the right of redemption. In this case, the tax sale occurred on May 13, 1991. GAA did not even assign the certificate to HNRG until July 23, 1993, over two years and two months from the date of the tax sale.

Similarly, § 14–821 limited the judge's discretion to disallow substitution under Rule 2–241. His only other option would have been to dismiss the case because, without substitution, the real party in interest—HNRG—would not have been maintaining the action. *See* Maryland Rule 2–201 (requiring actions to be "prosecuted in the name of the real party in interest"). As we earlier stated, the possibility of dismissal after the statute of limitations has run would place a limitation on the assignment of tax sale certificates, a limitation inconsistent with the tax sale statute.

The only remaining issue is whether we must remand the case to the circuit court for new, severed proceedings. In resolving this issue, we think it unnecessary to decide whether the substitution of HNRG created a misjoinder because, even assuming misjoinder, Fish Market waived its right to severance. Fish Market has never requested and still does not request severance. Its only purpose in raising the misjoinder argument was to obtain dismissal of the HNRG's claim. In *Tracy v. State*, 319 Md. 452, 457–58, 573 A.2d 38 (1990), we dealt with a similar situation in the analogous context of misjoinder of criminal counts. In that case, the defendant Tracy had sought dismissal of certain counts that he claimed were misjoined. We stated:

> "[T]he proper remedy for an improper joinder is a severance, not a dismissal. Tracy knew that the additional charges were 'joined' for trial with the prior charges, but he never asked for a severance. The only relief he requested was dismissal of the indictment charging counts 5 through 10. He was not entitled to have the indictment dismissed even if we assume it was improperly joined for trial with another charging document. By failing to specifically request a severance of counts 5 through 10, Tracy waived any right to a severance. 'A defendant can lose his rights under joinder and severance law by failing to assert them in a timely fashion. This is true even in the instances of misjoinder....' 2 W. LaFave & J. Israel, *Criminal Procedure* § 17.3(d), at 378 (1984)."

*Tracy, supra,* 319 Md. at 457, 573 A.2d 38. While criminal joinder rules may involve considerations different from civil joinder rules, we think the *Tracy* approach is appropriate in this case. Accordingly, we need not remand the case for severed proceedings because Fish Market, even if it would express a desire for severance, has waived any right to it.

Furthermore, even if the court had erred in failing to sever the claims, it would have been harmless error. We have consistently held that we will not reverse a civil judgment unless the complaining party shows both *error* and *prejudice. E.g., Harris v. Harris,* 310 Md. 310, 319, 529 A.2d 356 (1987). Prejudice exists when the error influenced the outcome of the case. *Id.* The absence of prejudice is perhaps most vividly demonstrated by the fact that Fish Market never has requested severance, nor does it give any indication that it desires severance. Combining the two properties in one proceeding did not compound the issues or cause Fish Market to expend extra time. On the contrary, the combined proceeding may have been more convenient for Fish Market because it had to appear at only one hearing, rather than two.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY PETITIONERS.*