## BUDGETARY ADMINISTRATION

MANDATORY APPROPRIATIONS FOR THE PUBLIC SCHOOLS – MARYLAND STADIUM AUTHORITY – ARTICLE XIX OF THE MARYLAND CONSTITUTION – QUESTIONS ABOUT THE AUTHORITY OF THE GOVERNOR OR GENERAL ASSEMBLY TO REDUCE OR REALLOCATE FUNDING FOR THE BUILT TO LEARN ACT

December 15, 2022

*Michael J. Frenz*
*Executive Director, Maryland Stadium Authority*

The Built to Learn Act of 2020 authorized the Maryland Stadium Authority (the "Authority") to issue up to $2.2 billion in bonds and to use the proceeds for public school construction projects throughout the State. 2020 Md. Laws, ch. 20. To pay the debt service on those bonds—that is, to pay the interest and repay the principal—the Act provides for regular transfers from the Education Trust Fund, a special fund in the State Treasury. The Education Trust Fund, in turn, is financed by revenues from commercial gaming in the State, in accordance with the requirements of Article XIX of the Maryland Constitution. Article XIX requires that certain gaming revenues may only be used to supplement funding for public education in six broad areas, but otherwise does not specify how the money must be allocated.

On behalf of the Authority, you requested our opinion on a series of questions about the Built to Learn Act's funding mechanism. Specifically, you asked: (1) whether the funding for debt service mandated by the Built to Learn Act can be reduced or reallocated to another purpose by either the Governor or the General Assembly; (2) whether the funding for education required by Article XIX of the Constitution more generally can be reduced by the Governor or the General Assembly, or can be reallocated to another purpose; and (3) what funding priority, if any, applies to the funds in the Education Trust Fund.

As to your first question: Under current law, the Governor and General Assembly cannot use the annual budget process to reduce or reallocate the debt service funding that the Built to Learn Act mandates. That is because a provision of the Act requires that a certain amount be deposited each year from the Education Trust Fund into a fund dedicated to debt service on Built to Learn Act bonds, Md. Code Ann., Econ. Dev. ("EC") § 10-649(g), and that

provision establishes a mandatory appropriation for public education, subject to constitutional protection. The Governor thus must include the amount that the statute specifies in the budget, Md. Const., Art. III, § 52(4)(f), (11), (12), and the General Assembly may not reduce it during the budget process, *id.* § 52(6). The Governor also may not reduce that appropriation or transfer the funds to another program after the budget is passed.

There are, however, some actions that the General Assembly could take to reduce funding for the Built to Learn Act by changing current law. For example, nothing would prevent the General Assembly from repealing or amending EC § 10-649(g) itself via ordinary legislation and thereby eliminating the constitutionally protected funding mandate. The General Assembly could also amend or eliminate § 10-649(g)'s mandate and make the change effective for only a single fiscal year, as long as it did so through the ordinary legislative process, such as via a Budget Reconciliation and Financing Act. The General Assembly also may have some, though not unlimited, latitude to reduce the flow of funds from commercial gaming *into* the Education Trust Fund, by amending the statute that currently governs how commercial gaming revenues are distributed at the time they are first received.

As to your second question: Assuming that § 10-649(g) remains in effect, our answer is the same as our answer to your first question. The amount specified by the statute must be appropriated, out of funds raised under Article XIX, for Built to Learn Act debt service and may not be reallocated to another purpose. If the General Assembly were to repeal or amend § 10-649(g), however, nothing in Article XIX standing alone would require that any funds be appropriated to repay Built to Learn Act bonds. Article XIX, by itself, does not mandate that funds be appropriated for any *specific* educational purpose, but instead gives the Governor and General Assembly discretion to allocate commercial gaming revenues to a variety of education-related purposes.

Finally, the General Assembly answered your third question during its most recent session, by providing that distributions for Built to Learn Act debt service are the first priority for the use of money in the Education Trust Fund.

# I
# Background

### A. *Maryland's Budget System*

Article III, § 52 of the Maryland Constitution defines the powers of the Governor and the General Assembly regarding the budget, appropriations, and spending of funds from the State Treasury. Md. Const., Art. III, § 52. Every year, the Governor must submit to the General Assembly a budget containing "a complete plan of proposed expenditures and estimated revenues" for the upcoming fiscal year, *id.* § 52(3), along with a "budget bill," which is introduced as legislation, *id.* § 52(5). With certain exceptions, the General Assembly may "strike out or reduce" any of the appropriations proposed in the Governor's budget bill. *Id.* § 52(6a).

Maryland's budget system traces its existence to a constitutional amendment ratified in 1916. 106 *Opinions of the Attorney General* 38, 39 (2021). For that reason, the governing constitutional provision—Article III, § 52—is often called the "Budget Amendment." The amendment aimed to centralize power over, and accountability for, the State's spending in the Governor. *Judy v. Schaefer*, 331 Md. 239, 245-46 (1993); *Bayne v. Secretary of State*, 283 Md. 560, 568 (1978).

But in more recent years, further amendments have increased the General Assembly's power over State spending. Originally, the General Assembly could only add a new Executive Branch appropriation, or increase an existing one, by passing a separate "supplementary appropriation bill" funded by a new tax. Md. Const., Art. III, § 52(6), (8); *see also Maryland Action for Foster Children v. State*, 279 Md. 133, 142-43 (1977) (describing the limited powers of the General Assembly to add new or increase existing Executive appropriations prior to 1978). In 1978, however, an amendment authorized the General Assembly to mandate, by statute, that the Governor include funds in the budget at a specified level for a specified program, *id.* § 52(11), (12), though such mandates cannot take effect in the first fiscal year after their enactment, *id.*, and once the Governor has added the mandated item to the budget the General Assembly may still strike or reduce the amount, 65 *Opinions of the Attorney General* 45, 49-50 (1980). Another amendment ratified in 2020, which will govern the budget starting with Fiscal Year 2024, will allow the General Assembly to increase or add appropriations for Executive Branch programs in the budget bill itself, as long as the total for all Executive Branch

appropriations does not exceed the Governor's original submission and the budget as a whole remains balanced. 2020 Md. Laws, ch. 645 (ratified Nov. 3, 2020) (adding Md. Const., Art. III, § 52(6b)).

The Constitution also protects certain categories of spending from alteration by both the Governor and the General Assembly. Spending for public education is one of those specially protected categories. Under the express terms of the Constitution, when the General Assembly "provide[s] by law" for a certain category of spending "for the public schools," the Governor must include that item in the budget "without revision." Md. Const., Art. III, § 52(11), (12); *see also id.* § 52(4)(f). The General Assembly, in turn, "shall not amend the Budget Bill so as to affect . . . the provisions made by the laws of the State for the establishment and maintenance of a system of public schools." *Id.* § 52(6). But, as we will explain further below, not every item of public-school spending receives this constitutional protection. *See* 60 *Opinions of the Attorney General* 197 (1975); 36 *Opinions of the Attorney General* 109 (1951).

Even after the budget bill is passed and the fiscal year begins, the budget is not set in stone. The General Assembly has empowered the Governor to adjust appropriations for the current year under certain conditions. *See* Md. Const., Art. III, § 52(13) (authorizing the General Assembly to "enact such laws not inconsistent with [§ 52], as may be necessary and proper to carry out its provisions").

First, the Governor, with the consent of the Board of Public Works, may reduce by up to 25% any appropriation the Governor "considers unnecessary." Md. Code Ann., State Fin. & Proc. ("SFP") § 7-213; *see generally* 106 *Opinions of the Attorney General* at 42-45. This power extends to most appropriations mandated by statute. 65 *Opinions of the Attorney General* at 52-53. But certain appropriations, including mandatory appropriations for public schools, are exempt from this budget reduction power. *Id.* at 49; SFP § 7-213(b).

Second, the Governor may use a "budget amendment" to transfer funds from one program to another within a unit of State government, or, in certain narrow circumstances, from one unit to another. SFP § 7-209. The Governor can also use a budget amendment to allocate unanticipated revenues unaccounted for in the budget. SFP § 7-217.

#### B.    *Article XIX and the Education Trust Fund*

Your questions concern funds raised under Article XIX of the Maryland Constitution.  Article XIX originally empowered the State to issue up to five "video lottery operation licenses," authorizing the license holders to operate "video lottery terminals" (that is, video slot machines) in five specified locations.  Md. Const., Art. XIX, § 1(b)-(c).  The General Assembly proposed Article XIX in 2007 to address the State's structural budget deficit, which was driven in large part by the growth in education spending.  *See* Md. Exec. Order No. 01.01.2007.23 (Oct. 15, 2007) (convening a special legislative session to address a structural deficit caused in part by an "important and necessary" increase in education spending).  The Legislature accordingly provided that the revenue raised from the video lottery operation licenses would be "for the primary purpose of raising revenue for" public education.  Md. Const., Art. XIX, § 1(c)(1).  At the 2008 general election, the voters ratified the proposed amendment and agreed to "authoriz[e] video lottery terminals (slot machines) to fund education."[1]

The General Assembly also passed an implementing statute, contingent on the ratification of Article XIX.  Among other details, that statute specified the distribution of the new revenues.  2007 Md. Laws, Spec. Sess., ch. 4.  The formula for dividing up "the proceeds of video lottery terminals" included shares for the casino owner; for the State's administrative costs; for "local impact grants" to address the impact of the new casinos on their localities; for the State's horse-racing industry to enhance prizes and upgrade racetracks; and for a new fund making grants to small and minority- and woman-owned businesses.  *Id.* (enacting Md. Code Ann., State Gov't ("SG") § 9-1A-27).  The remainder of the slot machine revenues would go to the new Education Trust Fund.  *Id.* (enacting SG § 9-1A-30).[2]  Expenditures from the Fund, which is a special fund in the Treasury, would be made "in accordance with the State budget" for educational purposes.  *Id.* (enacting SG § 9-1A-30(d)).[3]

---

[1]  2008 General Election Returns, Question 2, *Maryland Manual*, https://msa.maryland.gov/msa/mdmanual/42electg/html/2008/2008const.html.

[2] The actual percentage of video slot machine revenues dedicated to the Education Trust Fund varies by casino under the statutory formula, ranging from approximately one third to one half of gross revenue.  *See* SG § 9-1A-27(a)-(c).

[3] A special fund consists of State moneys that have been dedicated to a particular purpose.  The budget bill may not appropriate these funds to

Article XIX also provided that the voters could approve expansion of commercial gaming in the State by referendum. Md. Const., Art. XIX, § 1(e). In 2012, the voters narrowly approved a proposal to authorize a sixth casino in Prince George's County and to allow casinos to offer "table games" like roulette, blackjack, and poker. 2012 Md. Laws, 2d Spec. Sess., ch. 1.[4] The casino owner keeps 80% of the revenue from these table games, and 15% goes to the Education Trust Fund (with the remaining 5% to local jurisdictions). SG § 9-1A-27(d).

Prior to 2018, funds in the Education Trust Fund were generally used to satisfy the State's then-existing educational funding formulas, known as the "Bridge to Excellence" formulas, rather than to increase or supplement the overall level of education funding. *See* Revised Fiscal & Policy Note, H.B. 1697, 2018 Leg., Reg. Sess. at 4. However, some advocates and legislators believed that these funds should instead be used to increase total education spending. *See generally Hearing on H.B. 1697 Before the House Appropriations Comm.*, 2018 Leg., Reg. Sess. (Mar. 8, 2018). In response, the General Assembly proposed the so-called "lockbox" amendment to Article XIX, which was ratified in 2018.[5] 2018 Md. Laws, ch. 357; *see, e.g.*, Editorial, *Battle of the Lockboxes*, Balt. Sun, Feb. 18, 2018.

The lockbox amendment requires the Governor to include a specified amount of commercial gaming revenues in each year's budget "as *supplemental* funding for public education." Md. Const., Art. XIX, § 1(f)(1) (emphasis added). A use of funds qualifies as "supplemental" if it is "in addition to the State funding provided through the funding formulas established in the Bridge to Excellence in Public Schools Act of 2002 for prekindergarten

---

any other purpose, *see*, *e.g.*, 91 *Opinions of the Attorney General* 24, 29-30 & n.11 (2006), although the General Assembly may move money out of a special fund by enacting a statute separate from the budget, *see, e.g.*, 89 *Opinions of the Attorney General* 172, 178 (2004). When a particular revenue source has been dedicated by statute to a special fund, there is no need to appropriate those moneys *into* the special fund. *See* Letter from Richard E. Israel, Assistant Attorney General, to Sen. Laurence Levitan, at 2 (Mar. 31, 1988).

[4] *See also* 2012 General Election Returns, Question 7, *Maryland Manual*, https://msa.maryland.gov/msa/mdmanual/42electg/html/2012/2012const.html#referenda.

[5] 2018 General Election Returns, Question 1, Maryland Manual, https://msa.maryland.gov/msa/mdmanual/42electg/html/2018/2018const.html.

through grade 12 in public schools." *Id.* § 1(f)(3)(i). Starting in Fiscal Year 2023, that requirement applies to "100% of revenues raised for public education under [Art. XIX, § 1(c)(1)]"—that is, from video slot machines—and 100% of "any other commercial gaming revenues dedicated to public education." *Id.* § 1(f)(1)(iv). The amendment specifies six permitted uses for this supplemental education funding, one of which is to "[m]aintain, renovate, or construct public schools." *Id.* § 1(f)(2).

### C.    *The Stadium Authority and the Built to Learn Act*

The Maryland Stadium Authority is a "public corporation and instrumentality of the State" established in 1986. *Kelly v. Marylanders for Sports Sanity, Inc.*, 310 Md. 437, 439 (1987). The Built to Learn Act of 2020 charged the Authority with overseeing a new Statewide school construction program. 2020 Md. Laws, ch. 20. The Act empowered the Authority to issue up to $2.2 billion in bonds to "finance[e] acquisition, construction, renovation, and related expenses" for "public school facilities in the State." *Id.* (codified at EC § 10-628(c)(1)(vii)).

The Built to Learn Act bonds are explicitly not a debt or obligation of the State but are instead "a limited obligation of the Authority payable solely from money pledged by the Authority" for debt service on those bonds. EC § 10-649(d). To fund that debt service, the Act established the Supplemental Public School Construction Financing Fund ("Financing Fund"). EC § 10-658. The money in the Financing Fund will be used to pay regular debt service on the Built to Learn Act bonds, EC § 10-658(c), and is the only money pledged by the Authority for repayment on those bonds, *see* EC § 10-634.

The Built to Learn Act also contains a mechanism to deposit the funds necessary to pay debt service into the Financing Fund: "In accordance with § 9-1A-30 of the State Government Article," which establishes the Education Trust Fund, "the Comptroller shall deposit a portion of the money in the Education Trust Fund into the [Financing Fund]" twice each fiscal year. EC § 10-649(g). The Act requires that $30 million be deposited from the Education Trust Fund into the Financing Fund in Fiscal Year 2022, $60 million in Fiscal Year 2023, and $125 million each year starting with Fiscal Year 2024. *Id.* In 2022, the General Assembly enacted legislation clarifying that the "required deposits under [EC § 10-649(g)]" into the Financing Fund are the first priority for the use of money in the Education Trust Fund. 2022 Md. Laws, ch. 32 (codified at SG § 9-1A-30(d)(1)).

## II
## Analysis

Current law establishes a flow of money to pay debt service on bonds issued pursuant to the Built to Learn Act. Under SG § 9-1A-27, a substantial share of the revenue from commercial gaming in the State must be deposited in the Education Trust Fund. SG §§ 9-1A-27, 9-1A-30; *see supra* note 2 (explaining that the share varies by casino under a statutory formula, ranging from approximately one third to one half of gross revenue). Starting with Fiscal Year 2023, the Governor must include 100% of those deposits in the budget as "supplemental funding for public education." Md. Const., Art. XIX, § 1(f). The Built to Learn Act specifically requires that a fixed amount of that Education Trust Fund money be deposited in the Financing Fund to cover debt service on Built to Learn Act bonds. EC § 10-649.[6]

Your questions all concern the extent to which the Governor and General Assembly might alter that flow of money from commercial gaming to the Education Trust Fund "lockbox," and then to the Financing Fund. Answering those questions requires us to interpret both the Maryland Constitution and the relevant State statutes. The principles of constitutional and statutory interpretation are similar: in statutory interpretation, our overall objective is to determine the intent of the General Assembly, and in constitutional interpretation, "we seek 'the construction that effectuates the intent of [the provision's] framers.'" *E.g.*, *Fish Mkt. Nominee Corp. v. G.A.A., Inc.*, 337 Md. 1, 8 (1994) (quoting *Brown v. Brown*, 287 Md. 273, 277 (1980)). In both types of interpretation, we begin with the ordinary meaning of the language used, considered in its context, and we may end our analysis there if the language is sufficiently clear, though we may consider other sources of meaning, such as the provision's history and purpose, especially if the provision is ambiguous. *See id.* at 8-9; *see also* 97 *Opinions of the Attorney General* 58, 64 (2012). We also keep in mind that both statutes and constitutional provisions, especially those written in broad and general terms, may be interpreted in light of developments since their enactment. *Kindley v. Governor*, 289 Md. 620, 625 (1981); 68 *Opinions of the Attorney General* 48, 57-58 (1983). With those principles in mind, we turn to your questions.

---

[6] The Act contemplates that Prince George's County will construct or renovate at least six public schools by entering into a public-private partnership agreement with a private entity. Md. Code Ann., Educ. ("ED") § 4-126.1. The Financing Fund will also be used to fund Prince George's County's obligations under that public-private partnership agreement. *See* EC § 10-658(b)(3).

### A.    EC § 10-649(g) Deposits into the Financing Fund

Your first question is whether "the funding mandated in [EC] § 10-649 can be reduced or re-allocated to another purpose by either the Governor or the General Assembly."  As we will explain, the Built to Learn Act's requirement that "the Comptroller shall deposit" a specified amount from "the Education Trust Fund into the Supplemental Public School Construction Financing Fund" each year, EC § 10-649(g), establishes a mandatory appropriation for the public schools that is constitutionally protected from the Governor's and the General Assembly's ordinary budget powers. However, the General Assembly could eliminate that mandatory appropriation by amending or repealing § 10-649(g) itself.  The Legislature could also potentially amend SG § 9-1A-27, the statute that dedicates commercial gaming revenues to the Education Trust Fund in the first place, subject to Article XIX's requirement that public school funding shall be "the primary purpose" for the State's video lottery terminal revenues.  Md. Const., Art. XIX, § 1(c)(1).

### 1.    The Governor's and General Assembly's Budget Formulation Powers

We begin by considering whether the Governor may omit EC § 10-649(g)'s required amounts from the annual budget, or whether the General Assembly may reduce or eliminate them during its consideration of the budget bill.  *See* Md. Const., Art. III, § 52.  In both cases, our answer is "no."  Section 10-649(g)'s status as a mandatory appropriation for the maintenance of the public schools protects it from the exercise of these ordinary budget powers.

The Constitution charges the General Assembly to "by Law establish throughout the State a thorough and efficient System of Free Public Schools; and [to] provide by taxation, or otherwise, for their maintenance."  Md. Const., Art. VIII, § 1.  That provision is not self-executing but instead requires the General Assembly to determine "by Law" how to organize and finance the public school system.  *See Hornbeck v. Somerset County Bd. of Educ.*, 295 Md. 597, 631-32 (1983).  Thus, statutory education financing provisions implement and give substance to an express constitutional mandate.  The framers of the Budget Amendment (that is, Article III, § 52) sought to harmonize the new budget procedure with existing constitutional mandates where possible.  *See* Report of the Commission on Economy and Efficiency on a Budget System, Md. Senate Journal, 1916 Leg., Reg. Sess., at 129, 133 (Jan. 28, 1916) ("Goodnow Report"); *see also* 106 *Opinions of the Attorney*

*General* at 41 (explaining that Art. III, § 52 was developed from the Goodnow Report's recommendations).

With that idea of constitutional harmonization in mind, the Budget Amendment granted the State's educational funding mechanisms some protection from the annual budget process. More specifically, the Governor must include the spending estimates for "the public schools, as provided by law," in the budget "without revision." Md. Const., Art. III, § 52(11), (12); *see also id.* § 52(4)(f). The General Assembly, in turn "shall not amend the Budget Bill so as to affect . . . the provisions made by the laws of the State for the establishment and maintenance of a system of public schools." *Id.* § 52(6). In sum, then, once the General Assembly, in implementing Article VIII, has determined that the public schools require a certain amount of funds, the Governor and General Assembly—in their budget-formulating capacity—must provide those funds.

Because mandatory appropriations significantly constrain the budgetary discretion of both the Governor and the General Assembly, however, we have recognized that certain conditions must be met before a particular category of education spending will be treated as constitutionally protected. An item of education spending comes within the protection of § 52(4), (6), (11), and (12) only if the General Assembly has established it "by law"—that is, made it mandatory by statute. *See* 36 *Opinions of the Attorney General* at 111. Our prior opinions have also understood these constitutional provisions to require that educational appropriation mandates must "admit of no administrative discretion," a requirement we discuss further below. *Id.* To summarize, then, "two conditions must be satisfied before an educational budget item will be treated as a mandatory public school appropriation: (1) it must have been determined by the General Assembly to relate to or provide for 'the establishment and maintenance of a system of public schools'; and (2) it must be an item which has been made mandatory by law and which admits of no administrative discretion in determining the amount to be submitted as a budget estimate." 60 *Opinions of the Attorney General* at 201.

Section 10-649(g) of the Economic Development Article, enacted by the Built to Learn Act, fulfills those criteria. First, its funding mechanism provides for the maintenance of the State's public school system. Because school buildings are expensive projects that often must be financed by long-term borrowing, bonds for school construction—and, in turn, funds that are spent on debt service on those bonds—serve an educational purpose. *See* Md.

Op. Att'y Gen. No. 80-020, 1980 WL 127888, at *2 (Feb. 19, 1980) (unpublished). The bonds that have been issued, and that will be issued, under the Built to Learn Act are for the exclusive purpose of building and renovating public schools. *See* EC §§ 10-628(c)(1)(viii), 10-649, 10-650. Section 10-649(g) makes those bond issues viable, and thereby promotes the Act's underlying educational purpose, by ensuring that the Authority will be able to pay the principal and interest on the bonds.

But because the funding stream established by § 10-649(g) draws on funds raised under Article XIX, the requirements of Article XIX create an additional complication. Under Article XIX's "lockbox" provisions, commercial gaming revenues raised under Article XIX must be used as "*supplemental* funding for public education." Md. Const., Art. XIX, § 1(f) (emphasis added). There is a question, then, about whether funding for school construction under the Built to Learn Act qualifies as "supplemental" funding within the meaning of Article XIX. And if those funds are indeed "supplemental" under Article XIX, there is a second question as to whether "supplemental" funding under Article XIX can also qualify as necessary for the "establishment and maintenance" of the public school system, as required for those funds to be constitutionally shielded from the budget process. *See* Md. Const., Art. III, § 52(4), (6), (11), (12). In our view, the answer to both of those questions is "yes": the Built to Learn Act funds are "supplemental" within the meaning of Article XIX, and there is no inconsistency between funds being "supplemental" in that sense and also supporting an educational funding mandate.

Beginning with the first question, Article XIX, § 1(f)(3) requires that commercial gaming revenues "supplement[]" funding under the "formulas established in the Bridge to Excellence in Public Schools Act of 2002," i.e., the school funding formulas that existed in 2018 (and in 2008, when Article XIX was first ratified). At the time § 1(f) was proposed, the General Assembly expected it would soon enact new and increased funding mandates supplanting the Bridge to Excellence, *see* Revised Fiscal & Policy Note, S.B. 1122, 2018 Leg., Reg. Sess. at 3-4 (discussing recommendations of the Kirwan Commission and likelihood that increased education spending would become necessary), which later came to fruition with enactment of the "Blueprint for Maryland's Future," *see* 2021 Md. Laws, ch. 36. And the General Assembly apparently expected that "supplemental" funds under § 1(f) would be available to fulfill the expanded funding requirements of the Blueprint. *See, e.g.*, Revised Fiscal & Policy Note, S.B. 1122, 2018 Leg., Reg. Sess. at 4 (explaining that "[t]he allowable uses for the supplemental

funding" under § 1(f) "align with some of the preliminary recommendations of the [Kirwan Commission]," which proposed the Blueprint reforms); *Hearing on H.B. 1697 Before the House Appropriations Comm.*, at 20:45, 2018 Leg., Reg. Sess. (Mar. 8, 2018) (statement of Del. McIntosh); *see also* 2018 Md. Laws, ch. 357 (Preamble) (indicating that purpose of 2018 constitutional amendment was tied to the recommendations of the Kirwan Commission).

That is, part of the purpose of the education "lockbox" was to secure financing for the Blueprint's enhancements to public education funding, thereby fulfilling what lockbox advocates argued was the voters' original expectation upon ratification of Article XIX: that commercial gaming would support the expansion of funding for public schools beyond what the law required in 2008.[7] Both this history, and the text of § 1(f)—which refers only to the "Bridge to Excellence" formulas—suggest that Article XIX funds may support an educational funding formula without losing their "supplemental" character, as long as those funds go toward spending above and beyond the requirements of the "Bridge to Excellence."

This understanding, we recognize, raises difficult questions about how to define the baseline that Article XIX funds must "supplement," given that the Bridge to Excellence formulas which define that baseline no longer exist. Or perhaps the requirement that funding be "supplemental" to Bridge to Excellence no longer has any practical effect now that the Blueprint formulas have superseded the Bridge to Excellence formulas.

---

[7] The Blueprint formulas were projected to increase State education spending above the Bridge to Excellence mandated amounts by $971 million in Fiscal Year 2023, $1.2 billion in Fiscal Year 2024, and by a greater amount in each successive fiscal year, up to $2.8 billion in Fiscal Year 2030. Revised Fiscal & Policy Note, H.B. 1300, 2020 Leg., Reg. Sess. App. A. By contrast, Education Trust Fund revenues from commercial gaming have generally been in the vicinity of $500 million and have increased at a modest rate. Revised Fiscal & Policy Note, S.B. 1122, 2018 Leg., Reg. Sess. at 5 ex. 1. Thus, it is likely that the amount of money dedicated to supplemental funding for public schools under Article XIX will always be smaller than the difference between the amount Bridge to Excellence would have required and the amount Blueprint will require. This in turn suggests that the entire amount of Education Trust Fund revenues could be dedicated to funding the Blueprint formulas without violating the requirement that those funds "supplement[]" what Bridge to Excellence would have required.

We need not answer those questions here, though, because the Built to Learn Act provides for funding above the baseline—that is, funding that qualifies as "supplemental"—however the baseline is defined. Funding for school construction has traditionally been separate from the State's regular educational funding programs. That is, most if not all school construction funding has occurred outside of the Bridge to Excellence and Blueprint funding formulas and has instead been supported by general obligation bonds in the capital budget. *See* Revised Fiscal & Policy Note, H.B. 1783, 2018 Leg., Reg. Sess. at 15-19; Revised Fiscal & Policy Note, H.B. 1, 2020 Leg., Reg. Sess. at 20-23. Because those formulas have not mandated substantial funding for school construction, any school construction funding program is likely to qualify as a "supplemental" use within the meaning of § 1(f). Consistent with that understanding, Article XIX, § 1(f)(2)(vi) identifies the maintenance, renovation, and construction of public schools as a valid use for Article XIX "supplemental" funding.

Moreover, even if the State's regular school construction program were considered part of the § 1(f) baseline, the Built to Learn Act funds would not merit that same treatment, because those funds were intended to *supplement* the regular school construction program. The Built to Learn Act was enacted because the regular public school construction program cannot fund every deserving project, *see* Revised Fiscal and Policy Note, H.B. 1, 2020 Leg., Reg. Sess. at 20, given that the funding available under the regular program is limited by the State's estimates of how much new debt the State can "prudently" incur, *see* SFP §§ 8-112, 8-113. Indeed, the first priority of the Built to Learn Act is to fund approved school construction projects that have been "deferred due to fiscal constraints." EC § 10-650(a)(2).[8]

To the second question raised above—whether "supplemental" funding can qualify as "mandatory" for budget purposes—we do not see any logical problem with "supplemental" funds as that term

---

[8] We accordingly see no conflict between Article XIX's requirement (also reflected in SG § 9-1A-30(e)) that commercial gaming revenues be used for "supplemental" funding, and EC § 10-650(c)'s provision that Built to Learn Act funds represent "the State share" of school construction costs. The Built to Learn Act is providing the amount of funding that the State *would* otherwise have provided for a project under its regular construction program if it had the funds to do so. Though the same formula is used to calculate the State share, as distinguished from the local share, under both programs, the projects funded under the Built to Learn Act would not have received any State funding at all absent the Built to Learn Act—hence, the Act is "supplemental."

is used in Article XIX supporting the "establishment and maintenance" of the public schools. Funds may be supplemental in the sense that they add to some pre-existing baseline, while still being both mandatory and necessary in the General Assembly's judgment (and as a practical matter) to meet the requirements for the State's system of public schools. The General Assembly has substantial discretion to determine what "a thorough and efficient system of free public schools" requires, *see Hornbeck*, 295 Md. at 631-32; 36 *Opinions of the Attorney General* at 111-12, and therefore may establish new educational funding mandates or expand old ones in order to meet those requirements. Those new mandates may supplement the funding required under Bridge to Excellence, while still being necessary to provide for the public school system—as is the case with the Built to Learn Act.

We also note that the State's educational funding programs have changed many times since voters ratified the Budget Amendment in 1916. *See Hornbeck*, 295 Md. at 628-31.[9] In our view, the framers of the Budget Amendment would have anticipated that such changes could occur, including changes that would increase the overall level of funding, on the grounds that what was once adequate is no longer adequate. *See* 68 *Opinions of the Attorney General* at 57-58; *Norris v. Mayor & City Council of Baltimore*, 172 Md. 667, 675-76 (1937) (explaining that the Constitution "will be given a meaning which will permit the application of [its] principles to changes in the economic, social, and political life of the people").

The framers thus did not tie § 52's protections for education funding to any specific amount or formula. Nor did they foreclose the possibility that the General Assembly could supplement an older formula while at the same time determining the new amount to be necessary in light of current circumstances. Rather, they left it for the General Assembly to determine what level of funding to make mandatory. For all these reasons, we think funding derived from Article XIX may be dedicated "for the establishment and maintenance of [the] public schools" and made mandatory within the meaning of Article III, § 52, and thus constitutionally protected from the budget process, while still being "supplemental" to the Bridge to Excellence formulas within the meaning of Article XIX, § 1(f).

---

[9] In fact, the General Assembly comprehensively revised the State's educational funding formulas that very same year. *See* 1916 Md. Laws, ch. 506.

Turning to the second prong of our test for mandated education appropriations, the funding provided in EC § 10-649(g) has "been made mandatory by law." 60 *Opinions of the Attorney General* at 201. Whether the General Assembly has made an appropriation mandatory is a question of legislative intent. *See* 65 *Opinions of the Attorney General* 108, 110 (1980); Letter from Richard E. Israel, Assistant Attorney General, to Barbara Klein, Department of Fiscal Services (Mar. 30, 1984). Although analysis of legislative intent may consider various types of evidence, "[i]f the plain language of the statute is unambiguous and is consistent with the statute's apparent purpose," we ordinarily need not go further. *Comptroller v. Phillips*, 384 Md. 583, 591 (2005).

Here, the plain language and statutory purpose are in harmony. Section 10-649(g) provides that the Comptroller "shall deposit" the specified funds from the Education Trust Fund into the Financing Fund each year. The word "shall" generally implies a mandatory duty. *See, e.g.*, *Walzer v. Osborne*, 395 Md. 563, 580 (2006). In addition, the statute does not merely require the Governor to include funds in the budget, which might leave open the possibility that the funds could be removed from the budget or reallocated at a later stage in the process. *See* Letter from David W. Stamper, Assistant Attorney General, to David Romans, Department of Legislative Services, at 3 (Mar. 22, 2019) ("Romans Letter"). Instead, § 10-649(g) expressly directs the Comptroller to disburse the funds at specified intervals. This directive assumes there will be an appropriation authorizing that disbursement, since the Comptroller may not authorize disbursement of funds from the Treasury without an appropriation. *See* Md. Const., Art. VI, § 2.

Treating the EC § 10-649(g) disbursement as mandatory is also consistent with the statutory purpose. An appropriation mandate helps to ensure the availability of funds for debt service on Built to Learn Act bonds (even though, as discussed further below, the General Assembly retains the ability to alter the mandate). And by providing that the disbursement under § 10-649(g) is the first priority for the use of Education Trust Fund money, the General Assembly further confirmed its intent that that disbursement be mandatory. *See* 2022 Md. Laws, ch. 32 (amending SG § 9-1A-30(d)). We are thus confident that the General Assembly intended § 10-649(g) to create a *mandatory* appropriation.

We also see no "administrative discretion in determining the amount" to be disbursed to the Financing Fund under § 10-649(g). 60 *Opinions of the Attorney General* at 201. Although the "no

administrative discretion" test can sometimes be difficult to apply, *see, e.g.*, Letter from Patrick B. Hughes, Chief Counsel, Opinions & Advice, and Thomas S. Chapman, Assistant Attorney General, to Sen. Paul G. Pinsky and Del. Maggie McIntosh (Feb. 22, 2022) (considering whether the "no administrative discretion" test may be satisfied when factual projections or estimates are used as inputs to formula), we need not wrestle with any of those more difficult questions to conclude that the statute here leaves "no administrative discretion."

Far from providing any administrative discretion, the statute specifies the precise amounts to be distributed: $30 million in Fiscal Year 2022, $60 million in Fiscal Year 2023, and $125 million in Fiscal Year 2024 and each subsequent fiscal year. EC § 10-649(g)(2). Regardless of how the "no administrative discretion" test might apply under other circumstances, then, this statute clearly does not allow for any discretion. *See* 42 *Opinions of the Attorney General* 98, 98 (1957) (concluding that statute specifying minimum dollar amount for education required Governor and General Assembly to appropriate at least that amount).[10]

It makes no difference that the source of the mandatory appropriation is a special fund, the Education Trust Fund, rather than the General Fund. *Cf.* 68 *Opinions of the Attorney General* 86, 93-94 (1983) (concluding, outside the education context, that the General Assembly could mandate an appropriation from federal funds, which are treated similarly to special funds). Of course, a special fund is a smaller pool of money than the General Fund. Thus, drawing a mandatory appropriation from a special fund increases the likelihood that there will be insufficient cash on hand to fund the mandatory appropriation (whether because of a change to the special fund's funding mechanism, changed economic conditions, or some other cause). That is, in some future fiscal year, the Education Trust Fund might accrue less than the $125 million that EC § 10-649(g) requires. In that event, the actual distributions to the Financing Fund would be limited to whatever amount was in fact available in the Education Trust Fund. Although the amount disbursed would be less than the statute

---

[10] Article XIX, standing alone, does leave significant discretion as to how commercial gaming revenues are to be allocated. *See* Md. Const., Art. XIX, § 1(f). Here, however, we are not dealing with Article XIX standing alone, but with a statute that takes a specific, fixed dollar amount of the funds under Article XIX's overall umbrella and dedicates them to a particular purpose.

contemplates, there would still be no *discretion* as to the amount to include in the budget.[11]

Thus, in our view, EC § 10-649(g) establishes a mandatory public-school appropriation protected by Article III, § 52(4), (6), (11), and (12).  That means the Governor must include the mandated amount in the budget each year, and the General Assembly may not reduce or re-allocate it through the budget process.

### 2.    The Governor's Budget Administration Powers

From our conclusion that EC § 10-649(g) establishes a mandatory appropriation for the public schools, it also follows that the Governor could not reduce or divert the § 10-649(g) distribution by exercising the budget reduction and budget amendment powers under SFP §§ 7-213 and 7-209.  The budget reduction power, which allows the Governor to reduce an appropriation by 25% with the consent of the Board of Public Works, does not apply to "an appropriation for . . . public schools." SFP § 7-213(b)(2)(ii).  Although we have advised that this statutory exception does not protect *every* public-school appropriation, it does protect public-school appropriations (like this one) that are mandatory in the constitutional sense.  Letter from Jack Schwartz, Chief Counsel, Opinions & Advice, to William S. Ratchford, II, Director, Department of Fiscal Services, at 4-5 (Oct. 2, 1991); *see also* 65 *Opinions of the Attorney General* 45, 49 (1980) (recognizing that General Assembly could, by statute, authorize Governor to reduce mandated appropriations "except, of course, those given constitutional protection by [§ 52(6)]").

Similar reasoning applies to the budget amendment power, which allows the Governor to transfer funds among programs within a unit or, in certain circumstances, between units.  *See* SFP § 7-209.  The General Assembly delegated that power to the

---

[11] To be sure, the question of how to deal with a shortfall in the Education Trust Fund would be more difficult if the General Assembly had not (during this past session) specified an order of priority for disbursements from the fund, or if the General Assembly had established multiple mandatory appropriations drawing from the fund.  But neither of those problems exists here, so we need not decide how those scenarios would be handled.  Disbursements for Built to Learn Act debt service are the first priority use of the Education Trust Fund, *see* 2022 Md. Laws, ch. 32 (codified at SG § 9-1A-30(d)), and we are not aware of any other mandatory appropriations that expressly draw on the Education Trust Fund.

Governor under Article III, § 52(13), which allows the Legislature to "enact such laws not inconsistent with [the Budget Amendment], as may be necessary and proper to carry out its provisions." *See* 72 *Opinions of the Attorney General* 3, 5 (1987). But because the General Assembly could not alter a mandatory educational appropriation in the budget bill, *see* Md. Const., Art. III, § 52(6), it would be "inconsistent" with the Budget Amendment for the Legislature to authorize the Governor to do the same thing by statute, *see id.* § 52(13). In other words, given that the Governor and General Assembly could not impair the EC § 10-649(g) disbursement prior to passage of the budget bill, the Governor cannot do the same thing later, in the exercise of the gubernatorial budget administration powers.

### 3. The General Assembly's Power to Amend Statutes

There are, however, other actions the General Assembly could take to reduce the amount deposited into the Financing Fund under EC § 10-649(g). Most obviously, the General Assembly could amend or repeal § 10-649(g) itself. A mandatory appropriation statute is still a statute, and the General Assembly "cannot by ordinary legislation preclude the repeal or modification of a statute by a subsequent legislature." Letter from David W. Stamper, Assistant Attorney General, to Sen. Thomas M. Middleton, at 2 (Jan. 25, 2016) (citing cases); *accord, e.g.*, *Board of County Comm'rs of Prince George's County v. Donohoe*, 220 Md. 362, 367 (1959). The rule is no different for the State's educational appropriation mandates, which the Legislature has altered many times over the last century. *See Hornbeck*, 295 Md. at 628-31 (discussing history of changes to State education funding formulas).

We also see nothing in Article XIX that would override the well-established rule that the General Assembly always has the power to amend its own statutes. Article XIX requires that "supplemental funding" derived from commercial gaming revenue is limited to six educational purposes, including the maintenance, renovation, and construction of public schools. *See* Md. Const., Art. XIX, § 1(f). But Article XIX says nothing to preclude the Legislature from changing how the funds are allocated among those six purposes. Accordingly, we think that the General

Assembly could amend or even repeal § 10-649(g)'s funding mandate through ordinary legislation.[12]

The General Assembly could also alter or eliminate the § 10-649(g) mandate for a single fiscal year, while leaving it in place for future fiscal years, but only if it did so through the regular legislative process rather than through the budget. Such one-time alterations to mandates are commonly made through a Budget Reconciliation and Financing Act or "BRFA," *see Wynne v. Comptroller*, 469 Md. 62, 71 (2020), which, despite the name, is ordinary legislation and therefore not subject to constitutional restrictions on the budget.

Similarly, because the General Assembly always retains the power to amend its own statutes, it could also amend SG § 9-1A-27 to reduce the amount of commercial gaming revenue allocated to the Education Trust Fund, even if that would put the State's ability to comply with EC § 10-649(g) at risk. Currently, SG § 9-1A-27 provides for specified percentages of the gross revenue from video lottery terminals to be carved off for a variety of purposes and leaves "the remainder to the Education Trust Fund." SG § 9-1A-27(a)(9). But because the exact allocation is established by statute, not in Article XIX, the General Assembly could adjust the

---

[12] We considered whether such a change would raise questions under the United States Constitution, but we do not believe that it would. The U.S. Constitution forbids States to make any "Law impairing the Obligation of Contracts," including contracts where the State is a party. U.S. Const., Art. I, § 10; *U.S. Tr. Co. v. New Jersey*, 431 U.S. 1, 17 (1977). Here, though, the State has made no contractual promise that would preclude it from repealing § 10-649(g). Although any money *already* deposited into the Financing Fund is pledged, by contract, to the Built to Learn Act bondholders, *see* EC §§ 10-631, 10-634, nothing in the relevant contracts requires the State to continue making deposits into the Financing Fund. Indeed, each Built to Learn Act bond "shall state on its face" that the bonds are "not a debt, liability, or pledge of the faith and credit or the taxing power of the State . . . or any other governmental unit" and are "payable solely from money pledged by the Authority" for Built to Learn Act debt service "or money made available to the Authority for that purpose." EC § 10-649(d). A statutory amendment reducing or eliminating payments into the Financing Fund thus would not impair any contract between the Authority and the bondholders. *See, e.g.*, *City of Charleston v. Public Serv. Comm'n*, 57 F.3d 385, 392-93 (4th Cir. 1995) (explaining that Contract Clause analysis looks to "whether the abridged right is one that was 'reasonably relied' on by the complaining party") (citation omitted); *Stark v. Comptroller*, 78 Md. App. 599, 612-13 (1989).

allocation by amending the statute, thereby reducing the flow of money to the Education Trust Fund.

Indeed, Article XIX vests at least some discretion in the General Assembly to decide how to allocate the funds flowing from commercial gaming. The Article's text recognizes that not all revenues derived from commercial gaming must be devoted to public education. Section 1(c)(1), for example, authorizes the State to issue video lottery terminal licenses for the "*primary* purpose"— i.e., not necessarily the exclusive purpose—of raising revenue for education. Meanwhile, § 1(e) allows the State to authorize additional forms of commercial gaming if approved by a referendum, but it does not specify how any revenues raised from those additional forms of gaming must be used. Section 1(f), added in 2018 by the "lockbox" amendment, in turn requires only that "100% of revenues raised *for public education* under [§ 1(c)(1)]," and "any other commercial gaming revenues *dedicated to public education*," be included in the Governor's budget for educational purposes. Md. Const., Art. XIX, § 1(f)(1)(iv) (emphasis added). The emphasized language would serve no purpose if Article XIX required all revenues raised under § 1(c)(1) and § 1(e) to be dedicated to public education. *See* 97 *Opinions of the Attorney General* at 64 (recognizing that constitutional provisions should be read to avoid making any language superfluous). This suggests that only those funds specifically "raised for" or "dedicated to" public education are restricted to educational purposes by § 1(f).

Article XIX's history supports that understanding as well. At the same 2007 special session that proposed Article XIX to the voters, the General Assembly enacted what is now SG § 9-1A-27, dividing the revenues to be raised under Article XIX among a variety of purposes, many of them unrelated to education. 2007 Md. Laws, Spec. Sess., ch. 4. The framers of Article XIX thus never expected that 100% of revenues raised under that Constitutional provision would go to education. Further, by placing the provision specifying the allocation of revenue in the implementing statute rather than the Constitution itself, the General Assembly expressed its intent to retain some power over the allocation. *See, e.g.*, 62 *Opinions of the Attorney General* 275, 285 (1977) (explaining that, in interpreting a constitutional amendment, "the proceedings of the Legislature which proposed the amendment" may "throw useful light upon the purpose sought to be accomplished or upon the meaning attached to the words employed"). Nothing in the history of the 2018 lockbox amendment suggests an intent to disrupt this established understanding whereby some portion of the money raised from

commercial gaming could be dedicated to non-educational purposes. *See Hearing on H.B. 1697 Before the House Comm. on Appropriations*, at 39:00, 2018 Leg., Reg. Sess. (Mar. 8, 2018) (statement of Del. McIntosh).

To be clear, however, the General Assembly's discretion in this area is not unlimited. Article XIX requires that the revenues raised from video lottery terminals must be used "for the primary purpose of raising revenue" for public education. Md. Const., Art. XIX, § 1(c)(1). The ballot question that proposed Article XIX to the voters also stated that Article XIX's overall purpose was "to fund education" and emphasized § 1(c)'s "primary purpose" language.[13] *See* 62 *Opinions of the Attorney General* at 285 (explaining that "the circumstances attending the adoption of the organic law" are a relevant consideration in constitutional interpretation); Romans Letter at 3 (considering ballot question language in interpreting Article XIX). Thus, an amendment to SG § 9-1A-27 that reduced the flow of funds for education to such a degree that funding education could no longer be called "the primary purpose" of the State's video lottery terminals would conflict with Article XIX.[14] We need not draw that line for purposes of this opinion, however. For now, it is enough to observe that, on one hand, Article XIX does not require the General Assembly to dedicate 100% of commercial gaming revenues to education or to maintain the allocation of revenues exactly as it currently stands, but, on the other hand, there are some limits on

---

[13] *Supra* note 1.

[14] Article XIX, § 1(e), the provision under which table games are currently authorized, does not contain the same "primary purpose" restriction. However, given that the goal of Article XIX, taken as a whole, was to fund education, *see supra* note 1, a question remains as to whether a similar restriction would nonetheless apply to revenue from table games or any other type of commercial gaming authorized under § 1(e) rather than § 1(c). Indeed, when the General Assembly has authorized referenda on expanding commercial gaming under § 1(e), both the authorizing statute and the ballot question have generally provided that the gaming expansions would be for the "primary purpose of raising revenue for education." *See* 2012 Md. Laws, 2d Spec. Sess., ch. 1, § 6 (table games); 2020 Md. Laws, ch. 492, § 5(a) (sports wagering). This could mean that the General Assembly has understood the "primary purpose" restriction in Article XIX to apply to *all* commercial gaming revenues raised under Article XIX, not just video lottery terminal revenues. Alternatively, it could mean that the General Assembly has decided to apply the "primary purpose" limitation as a policy judgment, even where the Constitution does not require it. Again, we need not answer that question here.

the ability of General Assembly to reduce the flow of video lottery terminal revenues to educational purposes.

### B.    Other Funding Under Article XIX and SG § 9-1A-30

Your second question is "whether the funding required by Article XIX, § 1 of the State Constitution can be reduced by the Governor or the General Assembly, or [can] be re-allocated for a purpose other than as set forth in SG § 9-1A-30." As long as EC § 10-649(g) remains in effect, our answer to your second question is the same as our answer to your first. That is, whatever the Governor and General Assembly may be empowered to do, or may choose to do, with any of the remaining funds raised under Article XIX, the amount specified by § 10-649(g) must be deposited from the Education Trust Fund into the Financing Fund, because § 10-649(g) establishes a mandated appropriation for the maintenance of the public schools. If the Education Trust Fund ever contains less than § 10-649(g) requires—either because commercial gaming revenues themselves have declined, or because the General Assembly has altered the allocation of revenues under SG § 9-1A-27—whatever amount the Trust Fund does contain must be deposited into the Financing Fund. *See* 2022 Md. Laws, ch. 32 (codified at SG § 9-1A-30(d)).

But if the General Assembly were to repeal EC § 10-649(g)— or to amend it by regular legislation, such as a BRFA, so that its requirements do not apply in a particular fiscal year—nothing would require the Governor or the General Assembly to deposit any particular amount in the Financing Fund.[15] Article XIX only requires that commercial gaming revenues "raised for public education" or "dedicated to public education" (which, under the current statutory scheme, effectively means commercial gaming revenues deposited into the Education Trust Fund) must be used for one or more of six broad purposes, and that the funds be "supplemental" to the requirements of the Bridge to Excellence funding formulas. Md. Const., Art. XIX, § 1(f). Assuming the absence of a mandatory appropriation like that found in EC § 10-649(g), we see nothing in Article XIX standing alone that

---

[15] We assume that, if the General Assembly were hypothetically to repeal or amend § 10-649(g), it would also make a corresponding change to the language enacted at the 2022 session establishing § 10-649(g) deposits as the first priority use of money in the Education Trust Fund. *See* 2022 Md. Laws, ch. 32 (codified at SG § 9-1A-30(d)). To do the former but not the latter would create significant confusion, given that the new language in SG § 9-1A-30(d) explicitly presumes the effectiveness of § 10-649(g).

would prevent the Governor from budgeting the entire balance of the Education Trust Fund for, say, "high-quality early childhood education programs," Md. Const., Art. XIX, § 1(f)(2)(ii), and none for school construction or construction-related debt service.

To summarize, then, if EC § 10-649(g) remains in effect, the stream of funds to the Financing Fund is protected. But if § 10-649(g) were repealed or amended, the amount of further deposits into the Financing Fund, if any, would be a matter for the Governor's and General Assembly's discretion.[16]

### C. *Priority of Disbursements from the Education Trust Fund*

Your third question is "what funding priority, if any, applies to the funds in the Education Trust Fund." As discussed above, the General Assembly answered that question by enacting Chapter 32 of 2022, which provided that the required distribution of funds under § 10-649(g) is the first priority for the use of Education Trust Fund money. 2022 Md. Laws, ch. 32 (codified at SG § 9-1A-30(d)).

The same legislation provided that the second priority is "required funding . . . through continuation of" Bridge to Excellence—i.e., the State's previously existing educational funding formula—and the third priority is "supplemental funding for education and public schools." *Id.* The second and third priorities are based on language from a prior version of the statute. *See* 2022 Md. Laws, ch 32. It is possible that this second priority might no longer have any practical effect, given that the Bridge to Excellence formulas are themselves no longer in effect. But it is not necessary to resolve that conundrum to answer your question, because the statute makes clear that Built to Learn Act debt service is the first priority for the use of money in the Education Trust Fund.

---

[16] For purposes of this opinion, we need not decide all questions concerning how Article XIX standing alone divides power between the Governor and the General Assembly. For example, we do not decide whether, absent a statutory mandate like EC § 10-649(g), the General Assembly may "strike out or reduce" the Governor's proposed appropriations from the Education Trust Fund. Md. Const., Art. III, § 52(6); *see* Romans Letter (concluding that the General Assembly does retain that power). To answer your question, it is enough to conclude that, in the absence of an appropriation mandate, whether to continue to fund the Financing Fund would be left to the budget process.

## III
## Conclusion

In sum, § 10-649(g) of the Built to Learn Act establishes a mandated appropriation for public education which is protected by Article III, § 52(4), (6), (11), and (12), of the Constitution. The Governor accordingly must include the amount specified by § 10-649(g) in each year's budget, as an appropriation from the Education Trust Fund, and the General Assembly may not strike, reduce, or reallocate that appropriation in the budget. Nor may the Governor use the budget reduction or budget amendment power to reduce or divert the appropriation that § 10-649(g) requires.

However, the General Assembly retains the power to amend or repeal § 10-649(g) itself, and thus retains the power to eliminate the mandate permanently or during a particular fiscal year. The General Assembly may also have some discretion to reduce the flow of commercial gaming revenues *into* the Education Trust Fund by amending the statute that governs the distribution of those revenues, though that discretion is constrained to some degree by Article XIX. And if the General Assembly were to repeal or amend § 10-649(g), nothing in Article XIX standing alone would require the Governor or the General Assembly to appropriate funds for Built to Learn Act debt service. Finally, the mandatory annual distributions for Built to Learn Act debt service are, by statute, the highest priority use of money in the Education Trust Fund.

Brian E. Frosh
Attorney General of Maryland

Thomas S. Chapman
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice